**David BURNHAM et al., Plaintiffs,**

v.

**Russell G. OSWALD, New York State Commissioner of Correctional Services, and Vincent R. Mancusi, Superintendent, Attica Correctional Facility, Defendant.**

**Civ. No. 1971–132.**

United States District Court,
W. D. New York.

Oct. 28, 1971.

Herman Schwartz and Edward I. Koren, Buffalo, N. Y., for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of the State of New York (Joseph J. Ricotta, Dunkirk, N. Y. and John H. Stenger, Buffalo, N. Y., of counsel), for defendants.

CURTIN, District Judge.

On March 25, 1971, the plaintiffs instituted a lawsuit against the defendants seeking an order of this court permitting press interviews of inmates in New York State correctional facilities. During the summer of 1971, the parties voluntarily discussed the issuance of rules permitting press interviews, and, on July 15, 1971, the Department of Correctional Services issued "Administrative Bulletin # 9," entitled "Policy Statement and Guidelines on Release of Information to and Cooperative Effort with the News Media by Department of Correctional Services Personnel" [1] [hereinafter referred to as the "Guidelines"]. After the issuance of the Guidelines, there was no further court activity until September 28, 1971, when the plaintiffs made the pending application for limited preliminary relief.

Under the Guidelines, press interviews with inmates were allowed from July 15 to September 9, 1971. During that period, no newsman's request for an interview was denied. On September 9, because of the riot at Attica Correctional Facility, Superintendent Vincent R. Mancusi declared a state of emergency at the facility. From September 9 to September 12, limited interviews by pool reporters were permitted in the besieged D Block area. Since the riot was quelled on September 13, Mr. Mancusi and other

1. A copy of the Guidelines is attached as an appendix.

state authorities have denied newsmen's requests for interviews with inmates at Attica.

The repeated denials led to plaintiffs seeking and obtaining, on September 28, an order to show cause why an order should not be entered permitting "journalists the right to interview inmates of Attica Correctional Facility who wish to speak with them."

On October 7, 1971, the court held a hearing at which the plaintiffs presented the testimony of six reporters and the defendants the testimony of Superintendent Mancusi. The plaintiffs' witnesses were Fred Ferretti of the *New York Times,* Robert Schakne of CBS News, James Willwerth of *Time,* Clarence Dick Edwards of the *Amsterdam News,* Edward Hershey of *Newsday,* and Nat Hentoff, who is a staff writer for the *New Yorker,* a columnist for the *Village Voice,* and an associate professor at the Graduate School of Education of New York University.

The newsmen testified that since September 13, 1971 they had sought without success permission from correctional officials to conduct interviews with Attica prisoners. It was their consensus that interviews of prisoners would assist them in reporting all sides of the Attica situation. Since September 13, Commissioner of Correctional Services Russell G. Oswald and other state officials have made statements to the press and have participated in television interviews. The reporters claim that without access to the inmates' information they cannot give a balanced or complete version of what occurred on September 9–13. If permitted to interview prisoners, they would question them about their grievances, the causes of the uprising, what happened during the takeover, the conditions in D Yard during the period of September 9–13, what happened when the state forces suppressed the rebellion, and the conditions at Attica since that time.

At the hearing, Mr. Mancusi stated his opinion that to allow interviews at the present time would, in the language of Paragraph 3 of the Guidelines, "adversely affect the integrity, security, and safety of correctional programs and facilities, and inmates." He supported this conclusion by pointing to the climate of hostility between inmates and correctional officers, the disruption of programs and activities for inmates, the need for repairs of the institution's physical plant, the heavy demands which visits by attorneys and relatives placed upon correctional officers who were working twelve-hour shifts, and the need to protect inmates' constitutional rights in the face of the criminal investigation being conducted at the prison by Deputy Attorty General Robert E. Fischer. Mr. Mancusi was opposed to interviews not only of the prisoners who were still at the Attica Correctional Facility but also of others who had been transferred to other state correctional facilities and to hospitals. It was his opinion that it was not prudent to fix a date less than one month away from October 7 for returning to a policy of permitting press interviews.

It was not apparent to the court why these reasons, except for the concern for inmates' constitutional rights, would mandate the banning of interviews at hospitals and at other correctional facilities to which Attica inmates had been transferred.[2] Yet, when Mr. Mancusi was asked if he would oppose such interviews if a man were warned of his constitutional rights beforehand, he said that he would. It finally became apparent that the main reason for forbidding interviews was, as Mr. Mancusi testified, that "certain types of news stories

---

2. In a few instances, inmates transferred from Attica after the riot have been interviewed. Fred Ferretti of the *New York Times,* Edward Hershey of *Newsday,* and some other members of the press accompanying New York State Senator John R. Dunne on a tour of New York State correctional facilities were permitted to conduct such interviews. However, Robert Schakne of CBS News was informed that he could not interview inmates transferred from Attica to other institutions.

can be inflammatory; can have a devastating effect upon the climate; can provide a difference of opinion."

It should be pointed out that the court affords little weight in this decision to the argument that Attica Correctional Facility does not have space or personnel to accommodate newsmen, for not only are lawyer and family visits being permitted, but visits by some outside groups have evidently been permitted.[3]

The instant application initiated by the September 28 order is one for limited relief only. Plaintiffs' memorandum in support of their application sets forth the limits of their demand in this way:

> Plaintiffs present challenge to the defendants' current refusal to allow media-prisoner interviews is a limited one in that the July 15, 1971 Guidelines are not themselves being attacked here. This is not to say, however, that plaintiffs accept these Guidelines as proper. * * * But this is a matter for another day, since all that plaintiffs challenge at this time is the present specific denial.

The court is not asked to decide whether an inmate has a constitutional right to be interviewed by representatives of the news media, whether a correspondent has a constitutional right to interview an inmate who seeks or consents to be interviewed or whether the Guidelines infringe anyone's First Amendment rights. The question is whether the application of the Guidelines by correctional officials to forbid interviews of Attica inmates since September 13 is so unreasonable under present circumstances that the prohibition should be held to be an abridgement of any constitutional rights of the newsmen plaintiffs. The plaintiffs contend that the reasons given by Superintendent Mancusi for forbidding interviews are insufficient to support such a ban. They claim that none of the problems expounded by Mr. Mancusi in his testimony support a finding that to allow interviews will "adversely affect the integrity, security and safety of correctional programs and facilities, and inmates."

Reasonable men may differ about whether press interviews would presently heighten or lessen tension at Attica Correctional Facility. Compare the opinion of Superintendent Mancusi with the general views of Professor Lloyd E. Ohlin, expressed in an affidavit filed in Nolan v. Fitzpatrick, 326 F.Supp. 209, 212 (D.Mass.1971).[4] Reasonable men

---

3. The following article appeared in the *Buffalo Evening News*, October 13, 1971, at 61:

   3 VFW LEADERS TOUR ATTICA, TAKE TOUGH STAND ON RIOT
   By Buffalo News Staff Reporter
   ATTICA, Oct. 13—Three state leaders of the Veterans of Foreign Wars Tuesday visited Attica Correctional Facility.

   "I wanted to see the damage caused by prisoner criminals who committed new crimes while in jail," said State Commander John M. York of Walden.

   "There are too many bleeding hearts sympathizing with the inmates and not enough with their victims."

   Mr. York, who was accompanied by LaVern F. Fenton of Attica, past state commander, and Robert F. Stout of Attica, past district commander, took a stiff approach to inmate dealings.

   "When a man commits a crime against society, he loses his rights to bargain for anything," he said. "He's lucky to be eating, living and breathing."

   Mr. Fenton, a member of the VFW's National Loyalty Committee, called the riot less a protest for reform than a revolutionary act by people trying to overthrow the government.

   He attacked the roles and the presence of William B. Kuntsler, the civil rights attorney; Bobby Seale, the Black Panther leader, and Prof. Herman Schwartz of the State University of Buffalo Law School.

4. Professor Ohlin's affidavit read in part:
   "2. So far as I know, no research has been performed on the effects of permitting or forbidding prisoners to correspond with the press. There is no published body of scholarly or professional opinion on whether such correspondence would be a good or a bad thing from the penological viewpoint.

   3. When prisoners riot or go on strike, one of their demands is almost always access to reporters. Prisoners often feel that, in ordinary circumstances, they have no effective way of bringing their griev-

might also differ about what priorities should be given to visitation, rehabilitation and reconstruction of the prison facility in the aftermath of the riot.

■ A disagreement among reasonable men does not, however, necessarily rise to the level of a violation of constitutional rights. Before a federal court can act under the Civil Rights Act, there must be a clear violation of the constitutional rights of the party seeking relief. Although there is no doubt that in recent years the federal courts have subjected the administration of prisons to increased scrutiny, a federal court will not substitute its own judgment about what restrictions are required for the safety and security of the institution for that of the prison administrator unless a violation of constitutional rights is clear. *See generally* Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971).

In the instant case, the newsmen plaintiffs disagree with Superintendent Mancusi's determination that to allow press interviews at this time would adversely affect the security of the facilities, staff and inmates of Attica Correctional Facility. But they have failed to make a clear showing that this disagreement presently amounts to a violation of any constitutional rights which they may assert against correctional officials. Considering all of the circumstances of the instant case, the court cannot say at this time that the prohibition on interviews at Attica Correctional Facility is an unreasonable restriction on contacts between

prisoners and the press. The court therefore believes that at this time deference should be given to Superintendent Mancusi's judgment regarding press interviews.

Plaintiffs' application for an order giving journalists immediate access to Attica Correctional Facility is denied.

APPENDIX

STATE OF NEW YORK
DEPARTMENT OF CORRECTIONAL
SERVICES
ALBANY

July 15, 1971

ADMINISTRATIVE BULLETIN #9

TO: SUPERINTENDENTS OF CORRECTIONAL FACILITIES AND STATE INSTITUTIONS, DIRECTORS OF STATE HOSPITALS AND CAMPS, PAROLE AREA DIRECTORS AND SUPERVISORS, MEMBERS OF THE BOARD OF PAROLE, CENTRAL OFFICE GROUP AND DIVISION HEADS

FROM: RUSSELL G. OSWALD, COMMISSIONER (s) Russell G. Oswald

RE: POLICY STATEMENT AND GUIDELINES ON RELEASE OF INFORMATION TO AND COOPERATIVE EFFORT WITH THE NEWS MEDIA BY DEPARTMENT OF CORRECTIONAL SERVICES PERSONNEL

This policy statement is to be used as a guilding directive to all personnel who

---

ances to public attention. Costly and destructive prison riots are primarily designed to call public attention to felt abuses, rather than to bring about escape. Over the years, despite the good intentions of prison personnel, public concern and newspaper publicity have tended to be indispensable factors in bringing about prison reform, and these in turn have often resulted from prison disorders. Although one can never be sure, I think there is a good chance that letting prisoners correspond with newspapers and broadcasters would facilitate prison discipline by providing prisoners with a nonviolent and effective outlet for their grievances. In general, I think that the development

of more effective correctional practices would be helped by greater ventilation of prison problems.

4. To the extent that correspondence with the press actually brought about reforms making prisons more effective and humane, it would, of course, favor the rehabilitation of prisoners. Being allowed to write to the press might itself help to rehabilitate some prisoners by helping to make them feel able to accomplish something by their own efforts and without violating the law. It seems to me that allowing correspondence with the press would be more likely to help than to harm the rehabilitation process." 326 F.Supp. at 212 (1971).

may have occasion to respond to news media inquiries or initiate release of information to the news media.

The objective of this policy is to provide accurate information, and to be cooperatively responsive to requests, about Department policies, programs and other areas of public interest in an effort to keep the public fully informed of Department activities, while at the same time providing inmates and parolees under Department supervision their right to privacy.

This Administrative Bulletin supercedes any previous policy statement or guidelines issued on the release of information and is effective as of the date of this Bulletin, July 15, 1971.

### 1. *Information Sources*

Superintendents of Correctional Facilities and Directors of Area Parole Offices have responsibility for release of information and response to inquiries from news media representatives pertaining to their respective facilities and areas. (Lists attached)

Information pertaining to overall departmental operations, policies, procedures, etc., will be released or responded to through the Office of Public Information in Albany, N. Y. (Public Information Officer address and phone attached)

### 2. *Inquiries*

News media inquiries will be answered fully, frankly, and as quickly as possible depending upon the situation, accessibility and availability of required information.

### 2A *Data for Release*

The following data regarding inmates or parolees may be provided: name, age, birthplace, city of previous residence, physical description, commitment information, criminal record, institutions to which committed, institutional assignments and behavior, state of general health, cause of death, nature of injury or critical illness and actions regarding sentence or release.

Information regarding inmates and parolees adjudicated as Youthful Offenders will not be released under laws governing legal release of information regarding Youthful Offenders.

### 2B

In cases involving inmates and parolees facing possible court action due to commission of a new crime, details of past criminal background and other information which would indicate a previous criminal record will not be released in accordance with the agreement on Fair Trial-Free Press procedures designed to insure fair trials for offenders without prejudicial publicity.

### 3. *Press Interviews*

If it is deemed not to adversely affect the integrity, security and safety of correctional programs and facilities, and inmates or parolees thereof, the Superintendent or Area Parole Director may permit a representative of a newspaper entitled to second class mailing privileges, news magazine or other publications which would be entitled to a place on the Department's approved magazine list, news service, or radio and television network or station to interview an inmate or parolee in his custody.

Decisions of Superintendents or Area Parole Directors may be appealed to the Commissioner of Correctional Services.

Arrangements for specific, individual interviews with inmates or parolees are to be made through respective Superintendents or Area Parole Directors. The nature of the requested interview will be made known to the Superintendent or Area Parole Director. Inmates or parolees will be advised of the request for interview and if the individual approves, such interview will be granted.

### 4. *Use of Names and Photographs*

*Names*—In the best interests of the inmate and parolee, identification by

name will not be allowed unless the individual agrees to such use and signs a consent form for such use of name. Such consent forms will be provided by both the interviewing news representative and the Department of Correctional Services. Individuals adjudicated as Youthful Offenders will not be approved for use of name.

4A

*Photographs—Identifiable photographs* of inmates and parolees will not be allowed unless the individual agrees to be photographed and signs a consent form for such photograph and its use. Photographs of facilities will be allowed providing no *identifiable* inmate or parolee is shown in any of the photographs.

The same stipulations regarding Youthful Offenders under use of names will apply.

A photographer accompanying a reporter need not be regularly employed by the publication, station or news service, but he must be engaged by it and specifically assigned as the official photographer.

A photographer not accompanied by a reporter must meet all of the criteria of a bona fide reporter.

4B  *Recording of Interviews*

With the written content of the inmate or parolee, interviews may be recorded under the same stipulations on the use of names. Questions should be made known to the inmate or parolee and the answers discussed before the recording is made.

5.  *Facility Tours*

Representatives of the news media may make tours of correctional facilities upon request to the Superintendents of such facilities. In the course of these tours, news media representatives will have access to inmates in the general population and to staff members of the facility. Again,

anonymity is expected in comments or in photos of inmates. Staff members may be identified.

6.  *Exclusion of Interviews, Tours, Etc.*

Inmates under Death Sentence and their occupied cell areas are excluded from interviews and tours under Section 491 of the Code of Criminal Procedure which allows only specified visitors without an Order from the Courts. Tours of the room containing the electric chair, and photos of the "chair" will be permitted. No photographs shall be taken of an execution.

7.  *Emergency Situation*

In situations of an emergency nature, such as escapes, disturbances, etc., the cooperation of the news media is requested in that inquiries and information interviews be reasonably limited. The Superintendent of the facility where such emergency occurs will issue periodic up-dating reports and will be available for interviews as he deems necessary, timed for A.M. and P.M. press deadlines.

Emergency situations call for extensive effort on the part of the entire facility staff and, while every effort will be made to keep information current, the emergency of the situation must be respected and the cooperation of the news media will be appreciated.

7A

When a correctional facility is placed under a "State of Emergency," news media representatives will not be allowed access to certain areas as designated by the Superintendent.

Efforts will be made to provide secure areas from which photos may be taken. Approval and designated areas shall be at the discretion of the Superintendent. If the Superintendent judges that the situation is extremely hazardous to news photographers, effort will be made to provide official photographs as soon as available.