David BURNHAM et al., Plaintiffs,

v.

Russell G. OSWALD, New York State Commissioner of Correctional Services, and Vincent R. Mancusi, Superintendent, Attica Correctional Facility, Defendants.

UNITED STATES ex rel. Irving C. WALSTON, Petitioner,

v.

Vincent R. MANCUSI, Superintendent, Attica Correctional Facility, Attica, New York, Respondent.

Civ. Nos. 1971–132, 1971–336.

United States District Court,
W. D. New York.

May 16, 1972.

Herman Schwartz and Edward I. Koren, Buffalo, N. Y., for plaintiffs in Civil No. 1971–132.

Irving C. Walston, pro se in Civil No. 1971–336.

Louis J. Lefkowitz, Atty. Gen. of State of New York (Joseph J. Ricotta, Dunkirk, N. Y., and John H. Stenger, Buffalo, N. Y., of counsel), for defendants in Civil Nos. 1971–132 and 1971–336.

CURTIN, District Judge.

These consolidated actions present questions relating to claims that inmates of New York State correctional institutions and representatives of the news media have the right under the First and Fourteenth Amendments to communicate with each other. The claims fall within 42 U.S.C. § 1983, and the court has jurisdiction under 28 U.S.C. § 1343. In addition, the court has jurisdiction under 28 U.S.C. § 2201 to render the declaratory judgment sought in Burnham v. Oswald, Civil No. 1971–132.

The proceeding in Burnham v. Oswald was commenced by a complaint filed on March 25, 1971. The named plaintiffs sued as representatives of two classes defined as "all news media representatives seeking to interview inmates of New

York State correctional facilities and all inmates of New York State correctional facilities who wish to be interviewed."[1] The complaint alleged that it was the policy of the New York State Department of Correctional Services [hereinafter referred to as "Department"] to prohibit private interviews between newsmen and inmates, and it sought a declaration that this policy violated the rights guaranteed members of plaintiffs' classes by the First and Fourteenth Amendments.

Following the filing of the complaint, further proceedings in this court were postponed while representatives of the Department and counsel for plaintiffs voluntarily discussed the possible issuance of regulations permitting interviews of inmates by representatives of the news media. Counsel for plaintiffs received and commented upon proposed regulations. On July 15, 1971 the Department promulgated "Administrative Bulletin #9" entitled "Policy Statement and Guidelines on Release of Information to and Cooperative Effort with the News Media by Department of Correctional Services Personnel" [hereinafter referred to as "Guidelines"].[1a] Thereafter defendants moved to dismiss the complaint, and plaintiffs moved for summary judgment, raising several issues relating to the sufficiency of the Guidelines.

Before the motions could be heard by the court, the riot of September 9 to 13, 1971 occurred at the Attica Correctional Facility. Following the reestablishment of control of the institution by state authorities, defendant Mancusi banned press interviews of inmates at Attica. The newsmen plaintiffs then sought and obtained from this court an order requiring defendants to show cause why an order should not be entered permitting "journalists the right to interview inmates of Attica Correctional Facility who wish to speak to them." On October 7, 1971, the court held a hearing at which six reporters and defendant Mancusi testified about the ban on interviews. On October 28, 1971, the court denied the newsmen plaintiffs' application for immediate access to Attica, concluding that under the circumstances then existing deference should be given to defendant Mancusi's judgment regarding press interviews. Burnham v. Oswald, 333 F. Supp. 1128 (W.D.N.Y.1971).

Thereafter defendants indicated their desire to present further evidence relating to the sufficiency of the Guidelines. On December 10, 1971, the court heard the testimony of Walter Dunbar, Executive Deputy Commissioner of the New York State Department of Corrections. Mr. Dunbar's testimony was directed toward the challenges to the sufficiency of the Guidelines made by plaintiffs in their brief supporting the motion for summary judgment. Thus the testimony at trial reflected the changed posture of the case resulting from the issuance of the Guidelines subsequent to the commencement of the action. *See* Morris v. Travisono, 310 F.Supp. 857 (D.R.I.1970).

United States ex rel. Walston v. Mancusi, Civil No. 1971–336, was instituted by an order to show cause dated July 19, 1971. The pro se plaintiff, an inmate of the Attica Correctional Facility, alleged that his rights under the First and Fourteenth Amendments were violated by the refusal of the Superintendent of the facility to allow him to correspond with, and be visited by, a certain reporter. By an order dated September 16, 1971, *Walston* was consolidated with *Burnham*.

In *Walston*, as in *Burnham*, a reassessment of existing policy followed the commencement of the lawsuit challenging the policy. Thus, on January 31, 1972 the Department issued "Administrative Bulletin #20" entitled "Revised Rules Governing the Correspondence Program for Inmates" [hereinafter re-

---

1. As in Nolan v. Fitzpatrick, 326 F.Supp. 209, 211 (D.Mass.1971), the class aspect of this case has been ignored by the parties.

1a. The Guidelines are set forth as an appendix to the court's opinion in Burnham v. Oswald, 333 F.Supp. 1128 (W.D.N.Y. 1971).

ferred to as "Rules"]. As in *Burnham,* the parties have indicated that they wish the court to pass upon the sufficiency of the new regulations rather than upon the adequacy of the policy which they replaced.

In arriving at the decision in this case, the court has considered the testimony given October 7 and December 10, 1971 and the oral argument and written briefs presented by the attorneys for the parties.

Several aspects of the Rules and the Guidelines are at issue:

(1) The provision of the Rules governing content of inmates' letters to the news media ["The Correspondence Issue"].

(2) The provision in Paragraph 3 of the Guidelines which sets forth the standard to be used in determining whether an interview of an inmate by a newsman should be permitted ["The Standards Issue"].

(3) The procedures in Paragraph 3 of the Guidelines governing the granting of an interview and appeal by the inmate or newsman of a denial of an interview ["The Procedure Issue"].

(4) The failure of the Guidelines to provide for interviews between inmates and newsmen out of the presence of correctional personnel ["The Confidentiality Issue"].

Before turning to these specific issues, however, a discussion of the law governing the right of prisoners and newsmen to communicate with each other is appropriate.

■■ It is only with reluctance that this court interjects itself into the complex and troublesome problems of prison administration. The day-to-day task of fashioning rules for the guidance and control of inmates must be left to the correctional authorities. Sostre v. McGinnis, 442 F.2d 178, 197, 205 (2d Cir. 1971). Nevertheless, the court must act to protect the constitutional rights of inmates. *See* Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). The question presented is how far the constitutional rights and privileges enjoyed by members of the general community may be withdrawn from an inmate of a prison. Sostre v. McGinnis, *supra,* 442 F.2d at 188–189. The court must consider two somewhat conflicting principles in formulating answers to the question. The first is that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Second is the rule that "[a] prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945).

Applying these guides, the courts have held that various First Amendment rights survive incarceration. *See* Sostre v. McGinnis, *supra* (right to possess one's own writings); Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971) (right to send letters to news media); Brown v. Peyton, 437 F.2d 1228 (4th Cir. 1971) (right to receive religious literature); Walker v. Blackwell, 411 F.2d 23 (5th Cir. 1969) (right to receive religious literature and right to correspond with religious leader); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968) (right to receive black publications); Payne v. Whitmore, 325 F.Supp. 1191 (N.D.Cal. 1971) (right to receive newspapers and magazines); Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D.N.Y.1970) (right to receive a newsletter published by former inmates and often critical of prison authorities); Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970) (right to send to one's family a letter critical of prison officials and administration).

■ Although First Amendment rights of incarcerated persons may be restricted, nevertheless, because of the preferred status of these rights, a heavy

burden is placed upon correctional authorities to justify restriction. In Carothers v. Follette, *supra*, the court held that "any prison regulation which restricts the right of free expression that a prisoner would have enjoyed if he had not been imprisoned must be related both reasonably . . . and necessarily . . . to the advancement of some justifiable purpose of imprisonment." 314 F.Supp. at 1024. In Fortune Society v. McGinnis, *supra*, the court wrote that "[o]nly a compelling state interest centering about prison security, or a clear and present danger of a breach of prison discipline, or some substantial interference with orderly institutional administration can justify curtailment of a prisoner's constitutional rights." 319 F. Supp. at 904. Other formulations of the same standard are stated in Nolan v. Fitzpatrick, *supra*, 451 F.2d at 548, and Jackson v. Godwin, *supra*, 400 F.2d at 541.

The question directly involved in the instant cases is whether the right to communicate with a representative of the news media survives incarceration. Although there is authority to the contrary, *see* McDonough v. Director of Patuxent, 429 F.2d 1189 (4th Cir. 1970), it has been explicitly held that under the First Amendment a prisoner "retains the right to send letters to the press concerning prison matters." Nolan v. Fitzpatrick, *supra*, 451 F.2d at 547. This holding was justified as follows:

> In so concluding, we rely primarily on the fact that the condition of our prisons is an important matter of public policy as to which prisoners are, with their wardens, particularly interested and peculiarly knowledgeable. The argument that the prisoner has the right to communicate his grievances to the press and, through the press, to the public is thus buttressed by the invisibility of prisons to the press and the public: the prisoners' right to

speak is enhanced by the right of the public to hear.
451 F.2d at 547.

█ The court accepts this rationale and thus concludes that the right of an inmate to send letters to the press survives incarceration. In addition, this rationale is as applicable to visitation by newsmen. To say that inmates have the right to correspond necessarily means that, with suitable regulation, they must also have the right to have newsmen visitors. There are many inmates who would be deprived of their right to communicate if they could only correspond but not meet personally with newsmen. Further, there are many prison situations which can only be explored fully and accurately by a face-to-face interview. *See also* Washington Post Co. v. Kleindienst, Civil No. 467–72 (D.D.C. April 5, 1972).

█ These conclusions are buttressed by a consideration of the rights of the newsmen plaintiffs in the instant case. *See* Washington Post v. Kleindienst, *supra* (holding that newsmen have a right of access to inmates of federal prisons for interviews). Prisons are public institutions, the conduct and conditions of which are matters of legitimate public concern. Yet, "the right of the public to hear," Nolan v. Fitzpatrick, *supra*, 451 F.2d at 547, and "the public right to be informed," Washington Post v. Kleindienst, *supra*, at 6, depend to a very large degree upon the right of the press to gather information and to have access to news sources. *See* Note, The Right of the Press to Gather Information, 71 Colum.L.Rev. 838, 842–43 (1971). It is true that an inmate has a right to correspond with the court, with his attorney, with his family and with a few friends. Infrequently a private citizen may have an opportunity to visit and chat with him briefly. Members of the Legislature have a right to visit and talk to inmates but, because of the press of many other duties, these visits are not often made.[2]

---

2. The court has heard testimony in another hearing from a legislator who complained that he had difficulty in making arrangements through the Department to talk to certain inmates.

It is apparent that these limited avenues of communication are not good enough to bring to public attention a complete and accurate picture of prison life. The decision about what information may pass through prison walls must not be left to the administrators alone. There have been too many instances in the past when interviews were denied simply because they were inconvenient. Prison inmates live out of the public's sight and hearing. Opportunity for shoddy treatment and bureaucratic abuse exists. Access by the news media to the inside of prisons is the most effective way to give meaning to the rule that an inmate has the right to communicate and to the rule that the public has a right to know what goes on within prison walls. News interviews can expose failures and abuses in particular institutions and the public attention which results can lead to corrective measures and reform.

■ This does not mean, however, that access to prisoners by newsmen must, or can be unlimited. The administrator must have the power to restrict the time, place, length and frequency of the interview, and to make sure that inmates are protected from interviews where constitutional rights of the individual inmate may be involved. *See also* Washington Post v. Kleindienst, *supra*, —— F.Supp. at ——.

■ The Rules and Guidelines promulgated by the Commissioner give a limited right to inmates to correspond with newsmen, and a limited right for newsmen to conduct interviews. The question is whether the conditions and limitations are constitutionally permissible. As previously noted, restrictions on First Amendment rights must be warranted by state interests "related both reasonably . . . and necessarily . . . to the advancement of some justifiable purpose of imprisonment." Carothers v. Follette, *supra*, 314 F.Supp. at 1024. Each of the challenged restrictions imposed by the Rules and Guidelines will in turn be tested by this standard.

## THE CORRESPONDENCE ISSUE

Paragraph 2 of the Rules permits inmates of New York State correctional facilities to correspond with representatives of the news media. Paragraph 3 provides that all incoming and outgoing correspondence, except letters to public officials and attorneys, may be read by correctional personnel "to protect the safety and security of the facility, and to insure that the correspondence rules are followed." Paragraph 12 provides as follows:

. . . the following materials or contents are not authorized to be in correspondence: statements which are obscene or lewd, contain threats, imply blackmail, imply plots to escape, discuss criminal activities, contain codes to circumvent understanding of contents, plots to use overt action to overthrow lawful activity, solicitation of personal property or funds, and plans to evade rules of the facility.

■ Applying the appropriate constitutional standard, the court in Nolan v. Fitzpatrick, *supra*, concluded that the inmates had "a right to send letters to the press concerning prison management, treatment of offenders, or personal grievances except those which (a) contain or concern contraband or (b) contain or concern any plan of escape or device for evading prison regulations." 451 F.2d at 551. Likewise, the court in Sostre v. McGinnis, *supra*, although not explicitly stating the standard which it was applying, indicated that it would approve refusal to mail a letter seeking "the transmittal of contraband or laying plans for some unlawful scheme" or containing "a prisoner's recitation of complaints about his confinement in otherwise protected correspondence [which] were a mere pretext to accomplish his sole motivating purpose of communicating about restricted matters." 442 F.2d

at 200.[3] A necessary corollary of this ruling was that "prison officials may open and read all outgoing and incoming correspondence to and from prisoners." *Id.* at 201. Thus *Sostre* forecloses any question of the propriety of correctional authorities opening and reading inmates' letters. The restrictions contained in Paragraph 12 of the Rules appear to be no more than a restatement of permissible restraints on inmates' correspondence set forth in *Sostre* and *Nolan.*

## THE STANDARDS ISSUE

Paragraph 3 of the Guidelines, governing press interviews of inmates and parolees, provides as follows:

> If it is deemed not to adversely affect the integrity, security and safety of correctional programs and facilities, and inmates or parolees thereof, the Superintendent or Area Parole Director may permit a representative of a newspaper entitled to second class mailing privileges, news magazine or other publications which would be entitled to a place on the Department's approved magazine list, news service, or radio and television network or station to interview an inmate or parolee in his custody.

> Decisions of Superintendents or Area Parole Directors may be appealed to the Commissioner of Correctional Services.

> Arrangements for specific, individual interviews with inmates or parolees are to be made through respective Superintendents or Area Parole Directors. The nature of the requested interview will be made known to the Superintendent or Area Parole Director. Inmates or parolees will be advised of the request for interview and if the individual approves, such interview will be granted.

It appears that Paragraph 3 is deficient in several respects. The Superintendent may decline to allow an interview if he determines that it would adversely affect the "integrity" of the institution. "Integrity" is undefined in the Guidelines. The Superintendent, for example, could interpret "integrity" to mean the good reputation of the institution.[4] Additionally, Paragraph 3 vests too much discretion in the Superintendent. Under the paragraph he may permit an interview if certain conditions are not affected. In the opinion of the court, the law requires that the Superintendent *must* grant an interview unless denial is necessary to protect "a compelling state interest centering about prison security, or a clear and present danger of a breach of prison discipline, or some substantial interference with orderly institutional administration." Fortune Society v. McGinnis, *supra,* 319 F.Supp. at 904.

The court holds that an interview with a consenting inmate must be permitted unless it is determined that to hold the interview would present a clear and present danger of breach of the security, discipline or orderly administration of the institution, *cf.* Seale v. Manson, 326 F.Supp. 1375, 1383 (D. Conn.1971); Burnham v. Oswald, *supra,* or that the inmate had clearly abused his right of access to the press, *cf.* Sostre v. McGinnis, *supra,* 442 F.2d at 200, on a prior occasion.

## THE PROCEDURE ISSUE

Paragraph 3 of the Guidelines is deficient in a number of other respects. It does not definitely require that an inmate be given notice of a request for an interview and an opportunity to accept it or reject it. The paragraph is susceptible to a reading that the inmate will be informed of the request for an interview only if the Super-

---

3. An order incorporating language similar to that of these cases was entered by consent in Inmates of Green Haven Correctional Facility v. Zelker, Civil No. 1971–467 (S.D.N.Y., Jan. 18, 1972).

4. In other proceedings before this court, the Superintendent has interpreted "integrity" to mean the good reputation of the institution.

intendent has determined that to allow the interview will not adversely affect the integrity, security and safety of the institution. It is not clear who can appeal an adverse decision of the Superintendent.

 Procedurally Paragraph 3 runs afoul of the requirements of Sostre v. Otis, 330 F.Supp. 941 (S.D.N.Y.1971). There it was held that due process in the context of censorship of literature sent to prisoners required (1) notice, (2) some opportunity to object (either personally or in writing), and (3) a decision by a body that can be expected to act fairly. *Id.* at 946. The court sees no reason why these procedural guarantees should not be required where the restriction of other First Amendment freedoms, especially the right to interview and be interviewed, is contemplated.

 The court therefore holds that, prior to a determination whether a requested interview will be allowed, the inmate with whom the interview is sought must be given notice of the request and some opportunity to be heard in support of granting the interview. Likewise, the newsman must be given the opportunity to be heard in support of his request.

 The court does not believe that it would violate due process to vest in the Superintendent authority to determine whether a requested interview will be permitted as long as the standard to be applied in making the determination is a constitutionally proper one. The evil sought to be remedied by the third requirement of Sostre v. Otis, *supra,* was the possibility of arbitrary action by a single lower echelon officer acting without the guidance of clear standards. Vesting authority for decision in the official responsible for overall administration of the prison is permissible as long as he is guided by clear constitutionally proper standards. The provision for appeal of the Superintendent's decision to the Commissioner is an additional safeguard of fairness. While Paragraph 3 is unclear about standing to appeal, this court holds that either a newsman or an inmate aggrieved by an adverse decision of the Superintendent must be given the opportunity to appeal the decision to the Commissioner. This right to appeal follows logically from the holding that both the newsman and the inmate must be given the opportunity to be heard in support of granting the interview.

## THE CONFIDENTIALITY ISSUE

Plaintiffs argue that the failure of the Guidelines to provide for interviews out of the hearing of correctional personnel permits a chilling effect on the exercise of First Amendment rights. They point to several recent interviews attended by correctional personnel as evidence of the need for a provision protecting confidentiality. At trial, Mr. Dunbar contended that monitoring of interviews is necessary for the safety and security of the institution and of the interviewer and for the purpose of providing additional information to the interviewer. On cross-examination, however, he admitted that inmates' visits with family and attorneys are not overheard, the latter on the ground that the need for attorney-client confidentiality outweighs the security problem. It seems to the court that the problems of protecting the safety of the visitor are the same whether the visitor is a member of the inmate's family, his attorney or a newsman. If visits by family and lawyer need not be monitored, it is difficult to understand why news interviews must be overheard. Moreover, additional information may easily be supplied to a newsman by the correctional authority after the interview is completed, without infringing upon the ability of an inmate to speak freely to the reporter.

The only remaining justification for monitoring appears to be the need to protect the safety of the correctional facility. In the opinion of the court, this need may be secured by watching without listening. The court in Nolan v. Fitzpatrick, *supra,* 451 F.2d at 549, expressed the opinion that newsmen would

be less inclined than a family member toward the participation in an escape attempt or the transfer of contraband. Nevertheless, this problem appears governed by Sostre v. McGinnis, *supra*, 442 F.2d at 200–201. The court there held that the risk of plotting escapes or transferring contraband justified opening of all inmates' mail. It would be inconsistent to allow the correctional personnel to open and read mail in order to police escape plans or to prevent the transfer of contraband and yet prohibit them from monitoring interviews for the same purpose.

While monitoring of interviews by correctional personnel is permissible, the inmate interviewee may not be subjected to reprisal, retribution or retaliation because he granted the interview or because of what he said to the interviewer. *See* Sostre v. McGinnis, *supra*, 442 F.2d at 202–203. In addition, the role of the correctional officer is only to monitor in order to prevent the discussion of escape plans or the transfer of contraband. The officer cannot interrupt or interfere with the conversation between the inmate and the newsman to comment on the conversation. Correctional authorities have ample opportunity to express their position to the press after the interview is completed. If correctional authorities desire, monitoring may be accomplished by using a scheme other than the physical presence of the officer. For example, the interview might be held in a booth which is equipped for tape recording or other electronic recording. If this approach is followed, the newsman and the inmate should be informed of the monitoring.

### THE PAROLEE ISSUE

The complaint in this lawsuit seeks an order of this court permitting press interviews of inmates in New York State correctional facilities. Paragraph 3 of the Guidelines subjects parolees as well as inmates to the requirement of prior approval of an interview with a representative of the news media. In their briefs, plaintiffs challenge the require-

ment of prior approval for a parolee interview. However, there is no parolee who is a plaintiff in this action and there are no newsmen plaintiffs who allege that they sought an interview with a parolee which was denied. During the trial there was testimony about this problem. At one time in the proceeding, plaintiffs' attorney attempted to deliver to the court a sealed envelope purporting to contain a list of the names of parolees who desired to be interviewed. Because plaintiff would not consent to permit respondent to examine the list, the court refused to accept the exhibit. No motion was made to amend the complaint to include parolees. Under these circumstances, the question of whether prior permission must be obtained for a parolee interview is not before the court for decision.

Plaintiffs shall submit a judgment in accordance with this decision upon notice to the respondents.

So ordered.