QUESTIONS: 1. May the department and its personnel permit, without risk of liability, the videotaping of persons committed under Ch. 801, F.S., who have not been specifically ruled judicially incompetent when such persons have signed a written consent for the videotaping and when there is medical evidence that such persons will not be adversely affected by the videotaping? 2. May the department permit, without risk of liability, such videotaping of persons committed under Ch. 917, F.S., who have not been specifically determined to be legally incompetent when such persons have signed a written consent for the videotaping and when there is medical evidence that such persons will not be adversely affected by the videotaping? 3. Does the department, its divisions, or the director of a hospital have the authority to prohibit videotaping when the patient has a desire to appear through videotape, when there is no medical contraindication to videotaping, and when the media is actively seeking to perform the videotaping?
SUMMARY: Section 801.22, F.S., specifically prohibits the publication of the name of any person under the age of sixteen involved in a sex offense. Generally, the department and its personnel are immune from liability for torts under state and federal law while acting in good faith and within the scope of their authority. This determination is often a factual question as to whether the employee was acting in good faith and within the scope of his employment. However, when the department or its personnel acts in bad faith or performs acts that are ultra vires or otherwise contrary to law, the agency and its employees may be subject to liability for torts under state and federal law. The Department of Health and Rehabilitative Services, through the Division of Mental Health, is not prohibited from establishing a policy allowing persons above the age of sixteen years who have been committed under either Ch. 801 or Ch. 917, F.S., who have not been judicially determined to be incompetent, and who, based on medical determination, will not be adversely affected to sign a written consent to be videotaped at an institution of the department so long as the consent is voluntarily, intelligently, and knowingly made. The right of persons to communicate with the news media and of the media to have access to public institutions is protected by the First and Fourteenth Amendments and s.394.459, F.S., and a department head, division director, or hospital director may not prohibit the videotaping of consenting persons when there is medical evidence that such persons will not be adversely affected and when the news media has requested to perform the videotaping, provided that only those persons consenting are videotaped and there is no compelling state interest relating to the security of the institution or a clear and present danger of a breach of institutional discipline or some substantial interference with the orderly institutional administration that would justify curtailment of the videotaping. However, the time, place, length, and frequency of the videotaping may be regulated by institutional administrators. Because of the similarity and interrelationship of questions 1 and 2, I am combining these questions in answering your inquiry. I am also assuming that the research and treatment center created in Ch. 801, F.S., under the jurisdiction of the Division of Corrections of your department has not been established. As a result, those offenders under Ch. 801, F.S. (Child Molester Act), and Ch. 917, F.S. (Mentally Disordered Sex Offenders), who would normally be committed to the research and treatment center are presently confined in a facility of the Division of Mental Health, pursuant to s. 801.091(1)(b) and s. 917.28, F.S. Although s. 917.28, F. S., states that the Division of Mental Health "may" receive persons committed under this chapter until the research and treatment center under the Division of Corrections is established, this language has been interpreted as being mandatory. See AGO 068-21. AS TO QUESTIONS 1 and 2: Section 801.091, F.S., states: (1) When any person who is determined not to be psychotic has been convicted of an offense within the meaning of this chapter, it shall be within the power and jurisdiction of the trial judge to: (a) Sentence said person pursuant to the provisions applicable to the crime of which he was convicted. (b) Defer or withhold imposition of sentence and instead commit such person to the custody of the division for an unspecified length of time for treatment and rehabilitation in the center or such other facility as may be designated by the division. The Division of Mental Health will receive persons committed under this act until such time as the treatment center is established. (Emphasis supplied.) Implicit in the above statute is the fact that a patient found to be psychopathic would be committed as a patient of the Division of Mental Health rather than under Ch. 801, since reference is made only to the conviction of nonpsychopathic persons. Expressio unius est exclusio alterius, Peeples v. State, 46 Fla. 101, 35 So. 223, 4 Ann. Cas. 870 (1903); Dobbs v. Sea Isle Hotel, 56 So.2d 341
(Fla. 1952). Section 917.13, F.S., defines a "mentally disordered sex offender" as "a person who is not insane but who has a mental disorder and is considered dangerous to others because of a propensity to commit sex offenses." (Emphasis supplied.) It is well recognized that the law presumes that all persons are sane and, in the absence of evidence to the contrary, one is justified in acting upon this presumption. Armstrong v. State, 11 So. 618
(Fla. 1892); Dorman v. State, 279 So.2d 854 (Fla. 1973). Until the persons committed under either Ch. 801 or Ch. 917 have been judicially determined to be incompetent, it must be presumed that
such persons would have the mental capacity to give their consent for videotaping or other matters. Section 801.221, F.S., prohibits the publication of the name of any person under the age of sixteen. This statute reads in part: No person shall print, publish, broadcast or televise, or cause to be printed, published, broadcast or televised, in any manner, the name or identity of any unmarried person under the age of sixteen who commits, or is the victim of, or who is a witness to or concerning any sex offense. . . . Based on the above statute, the department or the division would be prohibited from allowing the videotaping of any person under sixteen regardless of whether such person gave his or her consent. As a general rule, in the absence of constitutional or statutory provision, a state exercising governmental functions cannot be made to respond to damages for torts. [See] 81 C.J.S. States s. 130. It is well established in the State of Florida that the state and its agencies cannot be sued without consent. Hampton v. State Board of Education, 105 So. 323, 42 ALR 1456; Seaside Properties, Inc. v. State Road Department, 121 So.2d 204; Pereira v. State Road Department, 178 So.2d 626; Valdez v. State Road Department, 189 So.2d 626. This immunity of the state has also been extended to officers and employees of state agencies where such officials are acting within the scope of their authority and their acts are not ultra vires or otherwise contrary to law. Hampton v. State Board of Education, supra. Thus, since your agency is an entity of the state, the department and its divisions would be immune from any state liability. Also, those officers and employees performing governmental functions within the scope of authority would be likewise immune. Regarding sovereign immunity, I hasten to add that the legislature has recently waived the state's immunity for liability for certain torts specified in the act. This act will become effective on January 1, 1975. Section 1, Ch. 73-313, Laws of Florida [s. 768.28(1), F.S. 1973], states in part: Actions at law against the state or any of its agencies or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions for injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of his office or employment under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this act. After January 1, 1975, the state may become liable for the torts by its subdivisions, agencies, and employees while acting within the scope of their authority if caused by negligence, wrongful act, or omission. Acts not covered under this legislation are those where the act was not within the scope of authority or is willful, malicious, or performed in bad faith. Thus, your department like other units of government could become liable for any act committed within the purview of s. 1, Ch. 73-313, Laws of Florida. However, where acts performed are not willful, malicious, or performed in bad faith, no individual liability would lie, and adequate provisions have been enacted in the statute for the purchase of insurance to cover awards against the state.
Although there may be no state liability for acts performed, liability for deprivation of civil rights might be sought under42 U.S.C. § 1983 which states: s. 1983. Civil action for deprivation of rights Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. It has been held that government officials have an absolute privilege under s. 1983 immunizing them from civil damage suits arising out of acts committed within the scope of their official duties. Ahlstrand v. Lethert, 319 F. Supp. 283 (D.C. Minn. 1970). Where a superintendent of a state mental institution acted in good faith and strictly in line with his official duty, he could not be held liable under s. 1983 for depriving another of rights and privileges while acting under color of law. Joyce v. Ferrazzi,323 F.2d 931 (C.A. Mass. 1963). Neither does the section afford any basis for civil actions against public officers acting in their official capacities in good faith and in pursuance of federal or state law. Fowler v. U.S., 258 F. Supp. 638 (D.C. Cal. 1966). A qualified privilege exists where a public official exercises discretion while performing his duties precluding individual liability for the performance of official responsibilities if undertaken in good faith; this privilege is not absolute and will give way if acts done within the scope of official duties were performed in bad faith. O'Brien v. Galloway, 362 F. Supp. 901
(D.C. Del. 1973). The conclusion that can be drawn from cases construing s. 1983, supra, is that a public official acting in good faith and within the scope of his or her official duties will be immune from liability under the section. Therefore, when the department, or its personnel acting in good faith and within the scope of their authority, establishes a policy allowing the videotaping of consenting persons above the age of sixteen who have been committed under either Ch. 801 or Ch. 917, F.S., who have not been judicially determined to be incompetent based on medical evidence that these persons will not be adversely affected by videotaping, it appears that no state or federal liability for torts would be incurred by the department or its personnel. The consent for videotaping should be in writing and must be voluntarily, knowingly, and intelligently made. Videotaping, in this instance, should be limited to those persons giving their consent. Contrarily, when the department and its personnel act in bad faith or perform acts that are ultra vires or otherwise contrary to law, the department and its personnel will be subject to liability for torts for such acts under both state and federal law. AS TO QUESTION 3: Question 3 involves the right of mental health patients to communicate with a representative of the news media and the right of access by the news media to mental health facilities. There are few decisions that have considered whether the First Amendment implicitly guarantees access to news sources under special conditions such as those here presented. While the right to publish is firmly established, the amendment's implications in terms of access are not resolved. In addition to cases cited elsewhere in this opinion, see generally, Grosjean v. American Press Co., 297 U.S. 233, (1936); Garland v. Torre,259 F.2d 545 (2d Cir. 1958), cert. denied 358 U.S. 910, (1958); Caldwell v. United States, 434 F.2d 1081 (9th Cir. 1970). This question was recently discussed in the case of Washington Post Co. v. Kleindienst (C.A. D.C., February 21, 1974), cert. granted, U.S. S.Ct. (#73-1265, March 4, 1974). Note: There are two district court opinions in this case. The United States District for the District of Columbia entered judgment for plaintiffs (Washington Post), 357 F. Supp. 770. Judgment was stayed by the United States Supreme Court pending appeal to the court of appeals,406 U.S. 912. The court of appeals remanded for additional findings,477 F.2d 1168. A supplemental opinion was issued by the district court, 375 F. Supp. 779 (1972). Since the district court opinions are reported together in the Federal Supplement, reference will only be made to the page number of these opinions. In Washington Post, the Bureau of Prisons promulgated a policy prohibiting any interviews of prisoners subject to the control of the bureau. The court upheld the grant of declaratory and injunctive relief for the newspapers and its reporters basing its decision on the right of newspapers to collect the news and the public's right to know the news. The court stated: Like the right of the public to know, the right of the press to access to newsworthy events is not without limits. . . . However, both logic and Supreme Court expressions suggest that the converse is equally true, that is to say, the right of access of the press to report an event is customarily as broad as the general public's access to witness it. See Estes v. Texas, 381 U.S. 532, 540 (1965). Restrictions that single out members of the news media and limit their access more grudgingly than the right granted the public at large should be examined with care and upheld only where the differential treatment is in response to an identified evil associated with press attendance. 14 Cr.L. 2421 (May, 1974), !mLN!x F.2d !mLN!x (1974). The court of appeals further stated that the right of access to the press of newsworthy events is necessarily antecedent to its First Amendment right to publish: . . . Obviously, excessive limitations on the ability to gather information would render the freedom to publish a hollow guarantee. . . . 14 Cr.L. 2421 (May, 1974), !mLN!x F.2d !mLN!x (1974). The district court found that the policy prohibiting interviews was arbitrary on its face and void under the First Amendment and that the bureau had no absolute right to exclude the press but has an obligation to lay open its activities to searching public scrutiny except to the extent that it can affirmatively establish compelling necessity to limit press access. [See] 357 F. Supp. 779, 780 (1972). Mental institutions, like prisons, are public institutions and the conduct of these institutions is a matter of public concern. Washington Post, supra. Access by the news media to institutional facilities has primarily been based upon the right of the public to know what is taking place in these facilities. The district court in Washington Post commented on access thusly: . . . Whenever people are incarcerated, whether it be in a prison, an insane asylum, or an institution such as those for the senile and retarded, opportunity for human indignities and administrative insensitivity exists. Those thus deprived of freedom live out of the public's view. It is largely only through the media that a failure in a particular institution to adhere to minimum standards of human dignity can be exposed. Indeed, needed reforms in these areas have often been sparked by press attention. Conversely, secrecy is inconsistent with responsible official conduct of public institutions for it creates suspicion, rumor, indifference, if not distrust. Disinterest causes abuses to multiply. . . .357 F. Supp., at 773. (Emphasis supplied.) Thus, where persons are confined or incarcerated in isolated facilities away from public scrutiny, the federal courts are likely to permit access to such facilities based on First Amendment rights. Similar results were reached in Burnham v. Oswald, 342 F. Supp. 880 (1972). There, the question was presented whether inmates of a state correctional institution and representatives of the news media had a right under the First and Fourteenth Amendments to communicate with each other. The court held: . . . access by news media to the inside of prisons is the most effective way to give meaning to rule that an inmate has the right to communicate as well as to rule that public has a right to know what goes on within prison walls, . . .342 F. Supp., at 880. Although newsmen have been given access to institutional facilities requiring maximum security and close supervision, there is no absolute and unrestricted right to such access. The Burnham court addressing this problem stated: . . . administrator must have the power to restrict time, place, length and frequency of interview, and to make sure that inmates are protected from interviews where constitutional rights of individual inmates may be involved; however, an interview with a consenting inmate must be permitted unless it is determined that to hold interview would present a clear and present danger of breach of security, discipline or orderly administration of institution, or that inmate has clearly abused his right of access to the press on a prior occasion. 342 F. Supp., at 880. (Emphasis supplied.) Further support for this right of access is found in Washington Post:[11] Under the First Amendment, subject to reasonable restrictions as to time and place, the press has right of access to interview confidentially and without censorship any inmate of a federal correctional institution who consents to be interviewed, except where it is determined that serious administrative or disciplinary problems are likely to be directly and immediately caused by the particular interview sought. . . .357 F. Supp., at 784. While the newsman's access may be restricted, guidelines must be narrowly drawn to prohibit interviews only where it can be clearly established that serious administrative or disciplinary problems are created. Washington Post, at 775. Again, at 357 F. Supp. 784 the court states: . . . If such rules authorize any exception to the general policy, the exception must be precisely drawn to prohibit an interview only where it can be established as a matter of probability on the basis of actual experience that serious administrative or disciplinary problems are, in the judgment of the prison administrators directly concerned, likely to be directly and immediately caused by the interview because of either the demonstrated behavior of the inmate concerned or special conditions existing at the inmate's institution at the time the interview is requested. The protection of the right of those persons desirous of being interviewed must be counterbalanced by protection of those that do not. There is, of course, an absolute right of privacy which the press cannot invade. Washington Post, at 772. An individual may refuse to be interviewed. Those who wish to maintain their privacy may, in furtherance of their own common right to privacy, exclude the press. Thus, authorities should allow only those persons consenting to communicate with the news media the right to do so. It is my understanding that the purpose of the news media in requesting permission to videotape consenting persons located at mental health facilities under Chs. 801 and 917, F.S., is to provide the public with information regarding the diagnosis, treatment, rehabilitative services, and programs available at these institutions. Chapters 801 and 917 are penal statutes, and based on the discussion above, prisoners may not be denied First and Fourteenth Amendment rights because of incarceration. Likewise, violence may be done to the equal protection clause of the Federal and Florida Constitutions when a sane inmate is denied rights available to other inmates solely because he or she is in the custodial care of a mental institution without some compelling state interest to justify the denial. More importantly, persons confined in mental institutions have the right to communicate freely and privately with those outside the facility. Section 394.459, F.S., The Florida Mental Health Act, states in part: (5) COMMUNICATION AND VISITS. — (a) Each patient in a facility [mental health] has the right to communicate freely and privately with persons outside the facility unless it is determined that such communication is likely to be harmful to the patients or others. It appears to be the legislative intent in the above statute that denial of the right of communication shall be limited to specific instances where the communication would be harmful to the patient or others. Absent such a showing, a patient cannot be denied the right to communicate because he or she is desirous of communicating with the news media, especially where other persons, e.g., relatives, friends, legislators, etc., are allowed such privileges. If a particular power is not expressly conferred or cannot be fairly implied from powers expressly conferred, it should not be exercised. State v. Fowler,105 So. 733 (Fla. 1925); Ideal Farms Drainage District v. Certain Lands,19 So.2d 234 (Fla. 1944); City of Pensacola v. Fillingim,46 So.2d 876 (Fla. 1958); AGO's 073-374; 074- 37; 074-49. Moreover, statutory authority given to administrative officers must be exercised in accordance with the requirements of controlling provisions and principles of law. Edgerton v. International Company, Inc., 89 So.2d 488 (Fla. 1956). To paraphrase the Oswald court regarding the need for media access to public institutions: Persons in mental institutions live out of the public's sight and hearing. Opportunity for shoddy treatment and bureaucratic abuse exists. Access by the news media to the inside of these institutions may be the most effective way to provide the resident with the right to communicate with the public and to make certain that the public has access to what is going on within the mental health facility. Videotaping may expose failures and abuses in particular institutions and the public attention which results can lead to corrective measures and reform. [See]342 F. Supp., at 886. Therefore, I come to the conclusion that mental institutions are public institutions, the conduct and conditions of which are matters of legitimate public concern and that access by the news media to those persons consenting to be interviewed may be the most effective way to give meaning to the statute that an inmate has the right to communicate as well as the rule that the public has a right to know what goes on within mental institution walls. A department head, division director, or hospital director may not prohibit the videotaping of consenting persons when there is medical evidence that such persons will not be adversely affected and when the news media has consented to perform the videotaping, provided that only those persons consenting are videotaped and there is no compelling state interest relating to the security of the institution or a clear and present danger of a breach of institution discipline or some substantial interference with the orderly institutional administration that would justify curtailment of the videotaping. However, the time, place, length, and frequency of the videotaping may be regulated by institutional administrators.