The WASHINGTON POST CO. and Ben H. Bagdikian, Plaintiffs,

v.

Richard G. KLEINDIENST, Acting Attorney General of the United States and Norman A. Carlson, Director, United States Bureau of Prisons, Defendants.

Civ. A. No. 467–72.

United States District Court, District of Columbia.

April 5, 1972.

Declaration and Order May 12, 1972.

Joseph A. Califano, Jr., Charles H. Wilson, Jr., Richard M. Cooper, Williams, Connolly & Califano, Washington, D. C., for plaintiffs.

Joseph Hannon, Michael A. Katz, Asst. U. S. Attys., Washington, D. C., for defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

This complaint seeks injunctive and declaratory relief. Plaintiffs, a newspaper and one of its experienced reporters, sought permission to interview certain prisoners at two federal penitentiaries: Lewisburg and Danbury. Defendant Carlson denied this request, relying on the Bureau of Prisons' Policy Statement of February 11, 1972, which flatly prohibits any interviews of prisoners subject to control of the Bureau, regardless of the reason for the request or the prisoner's status or offense.[1] Plaintiffs claim that this flat prohibition of the policy contravenes the First Amendment. They emphasize their desire to interview only prisoners willing to be interviewed and they recognize reasonable restraints as to time and place may be imposed so long as such interviews are not censored or overheard by prison officials. Restrictions upon interviews during periods of prison emergency are not questioned in this litigation.

Plaintiffs have a legitimate news interest. The Washington Post has run a comprehensive series on prison conditions, illustrated by articles attached to the complaint. The unsuccessful effort to interview which led to this litigation related to matter of obvious public interest. Recent work stoppages at Lewisburg and Danbury had apparently been satisfactorily resolved without bloodshed through negotiations between the Wardens and inmate representatives. Information subsequently came to the Washington Post that inmate ringleaders had been punished and that this was contrary to assurances given by prison authorities. The newspaper had reason to believe that some members of the inmate negotiating committees may have been placed in solitary, maced, deprived of necessary medical care and otherwise harshly treated. This information came from lawyers for inmates and their relatives, from prisoner letters and also from scattered congressional sources. The newspaper was interested not only in publicizing these apparently peaceful settlements which contrasted with several recent violent prison outbreaks but was prepared to expose any brutality or unwarranted retaliatory discipline if intimations received proved well founded.

Defendants contend that the press has no constitutional right of access to inmates for confidential interviews and urge that the same Bureau policy which permits contact between prisoners and the media both through uncensored mail and by casual conversations held in the course of prison tours[2] provides sufficient access and is not arbitrary.

The Court denied a temporary restraining order immediately after the complaint was filed. Thereafter a hearing was promptly held on the prayer for

---

1. Policy Statement No. 1220.1A is appended. Paragraph 4.b.(6) states in part: "Press representatives will not be permitted to interview individual inmates. This rule shall apply even where the inmate request or seeks an interview . . . ."

2. This is the meaning and effect of the second half of paragraph 4.b.(6) of the Policy Statement.

preliminary injunction. Testimony was taken from several penal experts [3] and the parties have filed detailed briefs. With consent of the parties the matter was submitted to the Court for final decision on the merits following the hearing.[4]

■■■■ There are few decisions that have considered whether the First Amendment implicitly guarantees access to news sources under special conditions such as those here presented.[5] While the right to publish is firmly established, the Amendment's implications in terms of access are not resolved. There is, of course, an absolute right of privacy which the press cannot invade. An individual may refuse to be interviewed. Those who wish to consult or meet in private for the day-to-day conduct of public or business affairs may, in furtherance of their own common right to privacy, exclude the media. These commonly accepted situations are, however, obviously quite distinct from the special circumstances presented by this particular controversy. Here the Bureau has not denied the press access to its own personnel. Rather, it has imposed a bar on persons placed in its care by the courts who may wish to talk with the press and are willing to be interviewed.

■■■■ There is no law that deprives prisoners of their right to speech by communicating with the press. Indeed, the courts have repeatedly been at pains to point out that the fact of conviction does not automatically deprive prisoners of rights guaranteed under the Constitution. "[A] prisoner does not shed his First Amendment rights at the prison portals." Brown v. Peyton, 437 F.2d 1228, 1230 (4th Cir. 1971). Indeed, "A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945). While "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights . . . ," reasonable necessity, to be determined on a case-by-case basis, must dictate any official retraction of such rights. Price v. Johnston, 334 U.S. 266, 285–286, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). The courts have repeatedly preserved First Amendment rights of prisoners to the free exercise of religion, Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Brown v. Peyton, supra; Barnett v. Rodgers, 133 U.S.App.D.C. 296, 410 F.2d 995 (1969); Long v. Parker, 390 F.2d 816 (3rd Cir. 1968); to receive mail, Palmigiano v. Travisono, 317 F. Supp. 776 (D.R.I. 1970); to receive newsletters, Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D.N.Y. 1970); and, notably, to communicate with the press by uncensored mail concerning prison management, treatment of offenders, or personal grievances, Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971).

■■■■ The press can be superficial, overly persistent and sometimes lacking in objectivity, but nonetheless the need

---

3. The following witnesses testified at the hearing: plaintiff Bagdikian; Benjamin Malcolm, Commissioner, New York City Department of Corrections; Leroy Anderson, Executive Assistant to the Director, District of Columbia Department of Corrections; Raymond K. Procunier, Director of Corrections of the State of California; Noah L. Alldredge, Warden, United States Penitentiary at Lewisburg, Pennsylvania; John J. Norton, Warden, Federal Correctional Institution at Danbury, Connecticut; and Norman A. Carlson, Director, Federal Bureau of Prisons.

4. Because of the constitutional issues the proceedings were expedited. The complaint was filed March 10, 1972, the TRO was denied March 13, 1972, and the full hearing was held March 23.

5. In addition to cases cited elsewhere in this opinion, see generally, Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Garland v. Torre, 259 F.2d 545 (2d Cir. 1958), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958); Caldwell v. United States, 434 F.2d 1081 (9th Cir. 1970).

to grant substantial press access to prisoners is readily apparent. Prisons are public institutions. The conduct of these institutions is a matter of public concern. Whenever people are incarcerated, whether it be in a prison, an insane asylum, or an institution such as those for the senile and retarded, opportunity for human indignities and administrative insensitivity exists. Those thus deprived of freedom live out of the public's view. It is largely only through the media that a failure in a particular institution to adhere to minimum standards of human dignity can be exposed. Indeed, needed reforms in these areas have often been sparked by press attention. Conversely, secrecy is inconsistent with responsible official conduct of public institutions for it creates suspicion, rumor, indifference, if not distrust. Disinterest causes abuses to multiply. *See* Grosjean v. American Press Co., *supra.*

The Bureau is not wholly unconscious of these considerations. It recognizes that the public has a legitimate and hopefully continuing interest in its affairs. It has not sought completely to black out the press. Federal penal institutions are open to reasonable press inspection and confidential mail communication between prisoners and the press is permitted. There is no evidence that the Bureau is attempting to conceal. In spite of the serious overcrowding and lack of adequate funds for personnel and essential programs, it is attempting to set a high standard of inmate care.

In refusing to permit press interviews under any circumstances, the Bureau is prompted by considerations of administrative convenience and possible disciplinary or other difficulties which undue press attention to particular inmates may engender, affecting either the individual prisoner or his fellow inmates. The Washington Post insists that the in-depth individual inmate interviews are essential to adequate, fair reporting. It contends that the limited access afforded under the Bureau's policy is wholly inadequate. Communication by correspondence is said to be too impersonal and timeconsuming. In order to write reliable stories, it is suggested, there is a need to observe demeanor, to probe by questioning and to overcome the barrier of semi-illiteracy and suspicion that may inhibit inmates when they write. Prison tours and related conversations with individuals or groups are characterized as too hit-and-miss, too limited, too casual, too unproductive to enable a reporter to probe a given situation.

Since "[t]he right to speak and publish does not carry with it the unrestrained right to gather information," Zemel v. Rusk, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1964), the issue here tendered is, nonetheless, whether the interview restraint imposed by the Bureau's policy is unduly restrictive. A continuing flat prohibition against press interviews of any prisoner, at any time, under any circumstances, in any institution, is on its face arbitrary. The burden of justification rests upon the defendants. *Cf.*, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). It is not a matter of the Court substituting its judgment for the Bureau's but rather whether, given the breadth of the prohibition, it appears after balancing the considerations pro and con that the justification offered is obviously deficient. In short, are the limitations placed on First Amendment freedoms no greater than is necessary to protect the governmental interests asserted?[6] As this inquiry is pursued there is no need to differentiate between the rights of the press and the rights of prisoners committed to the custody of the Bureau. News gathering and news dissemination cannot be disassociated

---

6. Sherbert v. Verner, *supra*; NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); DeJonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1939).

under circumstances such as these where it is assumed there is a mutual desire to communicate and where, in the last analysis, the public right to be informed may well overshadow either of the other two considerations. DeJonge v. Oregon, *supra*, 299 U.S. at 364–365, 57 S.Ct. 255.

Accordingly, it becomes necessary to examine the Bureau's justification for its absolute interview prohibition with care. Several considerations have prompted the Bureau's decision which was reached only after serious deliberation and study:

(1) Excessive press attention to a relatively few notorious prisoners has detracted measurably from their rehabilitative treatment and imposed administrative difficulties.

(2) When press interviews are held they receive immediate wide attention throughout the prisons and the importance of the prisoner interviewed is exaggerated among other inmates. Thus prisoners receiving wide press attention may become "big wheels" and have their status within the prison community enhanced to a point that seriously interferes with effective discipline. Seale v. Manson, 326 F.Supp. 1375 (D.Conn. 1971).

(3) A few prisoners may use the medium of the press to foster revolt within the walls. All news that goes out comes back in by newspaper, television and radio. Angry words, false accusations and protest geared to violence can light a fuse that erupts the pent-up emotions of inmates who may feel neglected and abused.

These are all real considerations and while somewhat impressionistic, they are supported by experience and advanced in good faith. The Court is satisfied, however, that the interview prohibition is too all-inclusive and that the factors mentioned do not justify a blanket denial of press access to all individual inmates willing to be interviewed. It is possible to prevent the difficulties and excesses feared by far less restrictive measures. Individual interviews may be refused where difficult administrative or disciplinary problems threaten and it goes too far to exclude all inmates from press access through individual interviews.

The National Council on Crime and Delinquency in its proposed model act to provide minimum standards for protection of rights of prisoners would permit press access to individual prisoners for interview. *Crime and Delinquency*, Vol. 18, January 1972, p. 13. See also, *An Introduction to Prison Reform Legislation Clearinghouse Review*, Vol. V, No. 11, March 1972, p. 667. Press interviews are freely permitted throughout the New York City correctional system, by the District of Columbia Department of Corrections, and by several states. (Exhibits 1–8, inclusive). Many tensions are thus relieved. California, for example, long had rules permitting interviews but terminated them after a recent outbreak at one prison attributed in part to many inflammatory interviews permitted a single prisoner. However, its knowledgeable, experienced Director, were it not for questionable legal advice, would still permit interviews in many sectors of his statewide correctional system.

Not only is there a difference in practice and viewpoint among correctional officials on the subject of press interviewing generally, but there is another overriding factor that calls into question the propriety of any blanket prohibition such as that presented in the Bureau's policy. The great bulk of federal prisoners, perhaps as many as ninety percent, are incarcerated for non-violent crimes. Many of these men and women in federal institutions have completed high school or its equivalent. Many are articulate and thoughtful.

Yet even prisoners released into the community under various training, furlough and other policies placing the prisoner into unsupervised contact with non-prisoners, may still not be allowed to talk with the press. The policy applies not only to the six major penitentiaries but also to the entire far-flung complex of

institutions, camps, community treatment centers, minimum security compounds, and schools and business establishments which employ offenders in various special programs.

Moreover, the Bureau is committed to many policies which are increasingly moving offenders out of traditional institutional confinements with a view to expanding community involvement in correctional programs to facilitate successful reintegration into society. *Biennial Reports, U.S. Board of Parole*, July 1968–June 1970, p. 14; and *Federal Bureau of Prisons*, 1970–71. It will further these objectives if the public is kept informed to the fullest extent possible and it will be only through increasing prisoner contact that the press can adequately report on activities and developments affecting those institutions. The contention that legal and practical considerations necessitate the total prohibition is not accepted.

To date, except in very special circumstances, the press generally has shown little interest in our prisons and the public has shown almost a callous disregard for the urgent needs of these imperfect institutions. The quality of a society may be measured by the manner in which it treats its criminal offenders. There is now, fortunately, a growing concern in this area expressed by the Executive, the Courts and the bar. Much wider press interest and more general public concern should be encouraged.[7]

The Bureau's no-interview policy violates the First Amendment by unqualifiedly denying the press the right to interview inmates. The rules of the Bureau must be more precisely drawn to prohibit interviews only where it can be clearly established that serious administrative or disciplinary problems are being created.[8] There are obviously less drastic means for accommodating the Bureau's proper purpose and still accommodating the strictures of the First Amendment.[9] Any outright restraint upon the ability of the press to gather information places a heavy burden on those who seek to justify it and the burden in this instance has not been met. NAACP v. Button, *supra*; Shelton v. Tucker, *supra*. Distinctions can readily be drawn to differentiate types of institutions and prisoners in the same or different categories. The thrust of new press regulations should be to permit uncensored confidential interviews wherever possible and to withhold permission to interview on an individual basis only where demonstrable administrative or disciplinary considerations dominate. There is no necessity to treat all inmates alike and it will be appropriate to recognize a high degree of discretion in individual prison administrators. The Bureau will be well advised to seek the advice of experienced newsmen, to leave room for experimentation and to move toward more flexibility in its policies and procedures governing prisoner-press contacts. (See tr. p. 134).

Defendants are directed to issue in thirty days a modified rule governing interviews consistent with this opinion. In the interim, interview requests must be considered on an individual basis. Defendants will be enjoined from enforcing the blanket interview prohibition now contained in the Bureau's Policy Statement.

The complaint contains not only a broad attack on the Bureau's Policy Statement but a specific demand for immediate access to interview prisoners at Lewisburg and Danbury. This special

---

7. "[T]he widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public . . . ." Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945).

8. The Court recognizes the proper reluctance of Courts to interfere with a prison's internal discipline and can accept without difficulty the rationale of such decisions as Burnham v. Oswald, 333 F. Supp. 1128 (W.D.N.Y. 1971), but it cannot agree with the broader view taken by the learned Judge in Smith v. Bounds, No. 2914 (E.D.N.C. March 14, 1972) for the reasons stated herein.

9. See cases cited note 6 *supra*.

request requires brief comment. After the complaint was filed, the Wardens of both institutions offered Bagdikian the opportunity to interview selected prisoners in a group without supervision or censorship but under time restrictions and to visit solitary where ringleaders were allegedly being held. Full advantage was not taken of these proffers, perhaps for reasons of litigating strategy. Only one inmate correspondent has apparently indicated a desire to be interviewed. Some of the prisoners involved are reported to be testifying in other public proceedings. The mails remain open. Under these circumstances, the Court declines to order the defendants to allow the specific interviews desired. These particular interview denials are invalid. They should be reconsidered by the Bureau in the light of this Memorandum Opinion and post-hearing developments. The request for mandatory or other emergency relief is denied. Plaintiffs' motion to reopen the record is denied.

The foregoing shall constitute the Court's findings of fact and conclusions of law. The parties shall submit an appropriate order within five days.

# APPENDIX

**BUREAU OF PRISONS**          **WASHINGTON, D. C.   20537**

## Policy Statement          1220.1A

SUBJECT:  INMATE CORRESPONDENCE WITH
REPRESENTATIVES OF THE PRESS          2–11–72
AND NEWS MEDIA

1.  PURPOSE.  This Policy Statement establishes the policy of the Bureau of Prisons, with respect to contacts with the press. The purpose is to protect First Amendment rights of inmates, within the constraints of sound institutional management.

2.  POLICY.  Recognizing the right of inmates to have access to the news media, inmates may correspond freely with representatives of the press. Representatives of the press are encouraged to visit Bureau of Prisons institutions, to learn about and report on correctional facilities, activities, and programs.

3.  DIRECTIVE AFFECTED.  Policy Statement 1220.1 is superseded by this Policy Statement.

4.  PROCEDURE.
   a.  *Application*
      This Policy Statement applies to the news media, which is defined as the following:
      A newspaper entitled to second class mailing privileges; a magazine or periodical of general distribution; a national or international news service; a radio or television network or station.
   b.  *Procedure*
      (1) An inmate may write to a representative, specified by name or title, of the news media. Correspondence to a newsman may be sent through the Prisoners Mail Box, which

provides opportunity for unopened correspondence with officials such as congressmen, judges, and other government officers. It shall be forwarded directly, promptly, sealed, and without inspection.

(2) A representative of the news media may initiate correspondence with a particular inmate. Incoming correspondence from the news media will be inspected solely for contraband, or for content which would incite conduct which is illegal. Rejected correspondence will be returned to the sender, with an explanation. Questions to the inmate may be presented through this correspondence, and the inmate may respond through the Prisoners Mail Box.

(3) The inmate shall not receive any compensation, nor anything of value, for material submitted through this means to the media.

(4) A transmittal slip, similar to the enclosed sample, will be attached to the outgoing PMB letter, and the mail will be sent each working day, in an institution envelope, and at government expense. Facilities with substantial numbers of psychiatric patients may also attach a statement, indicating that there are inmates in the facility who are psychotic. who have been found to be incompetent or of unsound mind, or who have other psychiatric problems.

(5) Representatives of the press are encouraged to visit Bureau institutions for the purpose of preparing reports about institutional facilities, programs and activities. Press representatives should make advance appointments for visits. During an institutional emergency, the Chief Executive Officer may suspend all such press visits. During the emergency, information concerning the situation will be provided regularly to the press.

(6) Press representatives will not be permitted to interview individual inmates. This rule shall apply even where the inmate requests or seeks an interview. However, conversation may be permitted with inmates whose identity is not to be made public, if it is limited to the discussion of institutional facilities, programs and activities.

(7) When media representatives visit institutions, photographs of programs and activities may be taken. Inmates have the right not to be photographed by the press. Visiting press representatives should be requested to obtain permission before photographing inmates and should be advised that full front view photos of inmates are not encouraged, but if taken, releases must be signed by the inmates.

(8) Press representatives may visit schools or business establishments which employ offenders in community programs, if the permission of the school or employer is obtained in advance. The rules outlined in paragraphs (6) and (7) above apply equally in the community situation.

(9) Announcements of unusual incidents shall be made to local news media as promptly as possible by the Chief Execu-

tive Officer or by a staff member designated by him. The institution will prepare a statement for release to the media, briefly stating the facts. The text of such messages shall be transmitted to the Bureau as part of the reports required on the incidents to which they relate. If it can reasonably be assumed that the wire services or the Washington press will make inquiry at the Central Office, the text should be communicated to the Central Office by telephone.

(10) Announcements related to Bureau policy, such as changes in institutional missions, type of inmate population, or physical facilities, as well as announcements of changes in executive personnel, will be made by the Central Office. Press inquiries on such subjects shall be referred to the Bureau Director.

(11) Information about an inmate that is a matter of public record will be provided by the Chief Executive Officer or his representative to representatives of the news media upon request. Such information shall be limited to the inmate's name, age, offense for which convicted, court where sentenced, length of sentence, date of sentencing, date of arrival or transfer, general institutional assignment, parole eligibility date, and date of expiration of sentence. Other contents of inmate files are confidential. Requests for additional information about individual inmates shall be referred to the Central Office. The Chief Executive Officer of each institution, or his designated representative, shall be solely responsible for contacts with the press. Other staff members shall refer all press inquiries to the Chief Executive Officer.

(12) Representatives of the media are encouraged to notify the Chief Executive Officer before publication or dissemination of information in inmate correspondence, whenever statements naming individual inmates or staff members are made in that correspondence. In such instance, the institution will give all possible assistance in providing background and a specific report on the statement provided by the inmate.

c. *Exceptions*

Requests for exceptions to the above regulations may be made to the Director of the Bureau. Any disputes as to meaning or application of the regulations will be resolved by the Director.

(s) Norman A. Carlson
NORMAN A. CARLSON
Director, Bureau of Prisons

————◆————

## DECLARATION AND ORDER

The case having come on for trial on March 23, 1972, on plaintiffs' motion for preliminary relief, the parties at the trial having consented to the submission of the entire case for final disposition on the merits, the Court having heard testimony and considered briefs, and the Court hav-

ing issued a Memorandum Opinion containing findings of fact and conclusions of law on April 5, 1972, it is this 11th day of April, 1972, hereby

Declared:

1. That the first two sentences of paragraph 4(b)(6) of the Bureau of Prisons Policy Statement 1220.1A dated, February 11, 1972, prohibiting all interviews by members of the press with inmates in the custody of the Bureau, are in violation of the First Amendment to the Constitution of the United States.

2. That defendants' denials of permission to plaintiffs to interview identified inmates at the federal correctional institutions in Danbury, Connecticut, and Lewisburg, Pennsylvania, made in reliance on Policy Statement 1220.1A, were in violation of the First Amendment.

3. That under the First Amendment, subject to reasonable restrictions as to time and place, the press has a right of access to interview confidentially and without censorship any inmate of a federal correctional institution who consents to be interviewed, except where it is determined that serious administrative or disciplinary problems are likely to result from the particular interview sought; and it is hereby

Ordered:

1. That defendants and personnel of the Federal Bureau of Prisons subject to their direction and control, are hereby enjoined from enforcing the blanket prohibition of press interviews with inmates contained in the first two sentences of paragraph 4(b)(6) of the Bureau of Prison's Policy Statement 1220.1A, dated February 11, 1972.

2. That defendants shall issue not later than 30 days from the date of this Order new rules governing press interviews with inmates in the custody of the Federal Bureau of Prisons. Such rules shall satisfy the following conditions:

a. The rules shall establish a general policy of the Federal Bureau of Prisons to permit, subject to reasonable restric-

tions as to time and place, confidential, uncensored press interviews with any inmates willing to be interviewed.

b. If the rules authorize any exception to the general policy, the exception shall be precisely drawn to prohibit an interview only where it can be established as a matter of probability on the basis of actual experience that serious administrative or disciplinary problems are, in the judgment of the prison administrators directly concerned, likely to be created by the interview because of either the demonstrated behavior of the inmate concerned or special conditions existing at the inmate's institution at the particular time the interview is requested.

3. That between the date of this Order and the issuance of the new regulations, defendants shall consider on an individual basis requests by the press to interview inmates who may be willing to be interviewed, and if such inmates are willing to be interviewed defendants shall grant such interviews except where it can be established that serious administrative or disciplinary problems would be created by the interview sought.