**SEATTLE-TACOMA NEWSPAPER GUILD, LOCAL #82, OF AMERICAN NEWSPAPER GUILD et al., Plaintiffs-Appellants,**

**George Sing Louie et al., Plaintiffs-Intervenors,**

v.

**Jacob J. PARKER, Warden, et al., Defendants-Appellees.**

No. 72-2330.

United States Court of Appeals, Ninth Circuit.

June 7, 1973.

Rehearing Denied July 25, 1973.

Koelsch, Circuit Judge, concurred specially and filed opinion.

Croil Anderson (argued), of Schroeter, Jackson, Goldmark & Bender, William H. Neukom (argued), of MacDonald, Hoague & Bayless, Robert Czeisler, Office of Public Defense, Seattle, Wash., Stanley A. Bass of NAACP Legal Defense & Educational Fund, New York City, Joel Benoliel of MacDonald, Hoague & Bayless, Seattle, Wash., for plaintiffs-appellants.

Leonard Schaitman, Atty., (argued), Harlington Wood, Jr., Asst. Atty. Gen., Dept. of Justice, Washington, D. C.; Stan Pitkin, U. S. Atty., Albert E. Stephan, Asst. U. S. Atty., Chief, Civil Section, Seattle, Wash., Morton Hollander, Atty., Dept. of Justice, Washington, D. C., for defendants-appellees.

Before KOELSCH and WRIGHT, Circuit Judges, and BELLONI,* District Judge.

* Of the District of Oregon.

EUGENE A. WRIGHT, Circuit Judge:

This appeal presents essentially one question: Does the First Amendment compel the warden of a federal penitentiary to permit individual press interviews with prison inmates by representatives of the news media? Two aspects of the First Amendment are involved. Is the warden in violation of (1) the First Amendment rights of his prisoners or (2) the First Amendment right of press access to the news, when he prohibits press interviews with willing prisoners?

Suit was brought by the Guild (one-half of whose members are newspaper reporters) and two individuals, one of them a free-lance writer. Their complaint sought temporary and permanent injunctions enjoining the appellees from denying the plaintiffs

(a) The right to access to McNeil Island Federal Penitentiary,

(b) The right to interview prisoners and strike leaders,

(c) The right to take still and moving pictures inside the prison,

(d) The right to interview McNeil officials and employees, and

(e) The right of access to records and administrative directives at McNeil regarding prisoner treatment and prison life conditions.

There had been disruptions in the nature of a prisoner strike at McNeil in 1971 and emergency measures were taken by prison officials to restore order and to prevent recurrences. Members of the Guild sought to interview strike leaders among the more than 1,200 McNeil prisoners and to take statements from prison officials. Some Guild members went to the island by government vessel, accompanied by photographers. They met with Warden Parker, Daggett's predecessor, and he refused permission for photographs, interviews with others or free access to prison records.

Until the disruptive strike, the policy of the prison had been to provide access to relatives, friends, attorneys, news

media, social workers, interested citizens, members of charitable organizations and other visitors, usually at scheduled times. The policy was curtailed during the strike because many prisoners refused to report for regular duties and destroyed government property. Contemporaneously, a group of protestors gathered and demonstrated at the Government pier on the mainland, the terminus for the vessel which transported personnel and supplies to the island. These circumstances caused a deployment of prison forces to preserve order, protect government property and prevent bodily harm.

Intervenors are McNeil prisoners who joined in the suit on their own behalf and on behalf of others similarly situated. They, too, sought injunctive relief from the prison policy of prohibiting press interviews. They claimed the policy violated their First Amendment rights of free speech, free press and the right to petition for redress of grievances.

While the suit was pending, the Bureau of Prisons reviewed its policies concerning access to prisons by press personnel. In February 1972, it issued a revised Policy Statement which defined news media,[1] recognized the right of inmates to have access to the media by correspondence,[2] and provided for other confidential correspondence from inmates.[3]

The Policy Statement further provided encouragement to press representatives to visit institutions for the purpose of reporting on facilities and programs [4] but with some limitations. Specifically, press interviews with individual inmates were prohibited.[5] It is this prohibition that is now challenged by both the press and the inmates.

Experience in other institutions, said the Bureau of Prisons, led it to conclude that inmate interviews would adversely affect prison discipline and administration.

The Bureau found that interviews had two separate damaging consequences: (1) disciplinary problems increased, following interviews with disruptive or non-cooperative prisoners, who encour-

1. "A newspaper entitled to second class mailing privileges; a magazine or periodical of general distribution; a national or international news service; a radio or television network or station." (Policy Statement 1220.1A, ¶ 4a).

2. "A representative of the news media may initiate correspondence with a particular inmate. Incoming correspondence from the news media will be inspected solely for contraband, or for content which would incite conduct which is illegal. Rejected correspondence will be returned to the sender, with an explanation. Questions to the inmate may be presented through this correspondence, and the inmate may respond through the Prisoners Mail Box." (Policy Statement 1220.1A, ¶ 4b(2)).

3. The prisoners may send confidential messages to:
    (1) The United States Courts;
    (2) Members of the United States Senate and the House of Representatives;
    (3) The Director of the United States Bureau of Prisons;
    (4) The Attorney General of the United States;
    (5) The President and the Vice President of the United States;
    (6) Members of the United States Board of Parole;
    (7) The Pardon Attorney;
    (8) The Surgeon General, United States Public Health Service;
    (9) The Secretaries of the Army, Navy, and Air Force.
    Bureau of Prisons Policy Statement, No. 7300.2B.

4. "Representatives of the press are encouraged to visit Bureau institutions for the purpose of preparing reports about institutional facilities, programs and activities." (Policy Statement 1220.1A, (5)).

5. "Press representatives will not be permitted to interview individual inmates. This rule shall apply even where the inmate requests or seeks an interview. However, conversation may be permitted with inmates whose identity is not to be made public, if it is limited to the discussion of institutional facilities, programs and activities." (Policy Statement 1220.1A, ¶ 4b(6)). (The last sentence above permits only casual conversations held in the course of prison tours.)

aged others to adopt their hostile approach, and (2) prisoners interviewed because celebrities or "big wheels," less subject to constructive rehabilitation. The Bureau believes that all prisoners should receive equal treatment, except for individual physical, mental and moral needs. Defendant Carlson, Bureau Director, supplied the district court with an affidavit on this subject.[6]

In his oral decision, the district judge noted that McNeil is a "maximum security" institution, designated for detention of selected prisoners. Its officials face serious disciplinary and security problems because McNeil has few first offenders and many recidivists with multiple convictions of crimes of violence. Finding that the rule against inmate interviews "is calculated to avoid a disruptive influence in the internal operation" of a federal prison, the court concluded that the Bureau regulation is not unconstitutional or oppressive but is "reasonable and is designed to give the administration of the institution some flexibility to adequately meet their responsibilities."

All parties having moved for summary judgment, the district court granted the motion of appellees and dismissed the action.

## THE INMATES

It is axiomatic that prison inmates retain constitutional rights, and that "a prisoner does not shed his first amendment rights at the prison portals." Brown v. Peyton, 437 F.2d 1228, 1230 (4th Cir. 1971). However, it is equally clear that " . . . [l]awful incarcer-

ation brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

As another Court of Appeals has pointed out:

"Imprisoned felons and inmates of such institutions * * * cannot enjoy many of the liberties, the rights and the privileges of free men. They cannot go abroad or mount the housetops to speak. They are subjected to rigid physical limitations and to disciplinary controls which would find no shred of justification in any other context. Even the disciplinary powers of military authorities are not so absolute." McCloskey v. Maryland, 337 F.2d 72, 74 (4th Cir. 1964).[7]

■■ The Director of the Bureau of Prisons and the Warden at McNeil Island are responsible for the security of the prison and the safety and rehabilitation of its inmates, and accordingly they must be given wide discretion in formulating rules to govern prison life. In the instant case the Bureau of Prisons has given considerable study to the disruptive effects of prisoner interviews on prison administration, and has concluded that the ban on interviews is necessary to maintain the discipline, custody and control of the prison. We are unable to say that that conclusion "lacks support in any rational and constitutionally acceptable concept of a prison system." Sostre v. McGinnis, 442 F.2d 172, 199

6. " * * * Prisons invariably have inmates drawn from all walks of life, including the rich and the poor, the prominent and the obscure, the celebrated and the unknown. Prison life is intended to provide an equality of living without echelons of strata based upon past civilian life. If publicity or renown were accorded individual prisoners by publicity, favorable or unfavorable, it would violate this principle and create further internal rivalries within the prison and tend to promote special treatment of such persons.

"Limiting interviews would not eliminate and at best could reduce the adverse effect described above because it would still result in allowing special treatment for individuals of renown or who seek publicity. * * *" (Tr. 230, 364)

7. See also, Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971) (en banc); McDonough v. Director of Patuxent, 429 F.2d 1189 (4th Cir. 1970).

(2d Cir. 1971) (en banc). We find that the interview ban is reasonable action within the scope of the wide discretion of the prison administrators and that it does not violate the prisoners' First Amendment rights. Smith v. Schneckloth, 414 F.2d 680 (9th Cir. 1969).

In concluding that the institutional concerns override the interest of the individual inmate in talking face to face with a member of the news media, we note that such a deprivation will not allow any real complaint about the treatment of the inmate or the administration of the prison to go unredressed. Prisoners are allowed by Bureau regulation to confer freely with their counsel, to conduct unlimited confidential correspondence, to visit with relatives and friends, to counsel with clergymen of their faith, and most important, to have free access to the courts. This court, as others, gives prompt and careful attention to prisoner petitions [8] alleging violations of civil rights [9] and counsel is appointed to assist the prisoner in those cases where the need therefor is demonstrated.

## THE PRESS

Federal prisons are public institutions, and their administration is a matter of concern to all citizens. Decisions recognizing "the paramount public interest in a free flow of information to the people concerning public officials, their servants," [10] are equally applicable in the realm of prison administration. The importance of the media in providing public information about the conduct of these institutions is undisputed. Indeed, it has often been through the zealous efforts of the news media that failures in a particular institution have been exposed.

We are acutely aware of the public's need for information in this area. However, we do not accept the argument that the public interest in having its prisons secure and free from disruptive influences and in the rehabilitation of prisoners is insufficient to outweigh the uncertain burden on news reporting that allegedly results from prohibiting prisoner interviews.

We have already noted that the regulation in question is rationally related to the achievement of legitimate goals of prison administration. Appellant Newspapers Guild argues that despite the wide discretion allowed administrators in the formulation of rules and regulations governing prisons, there is nonetheless an absolute right to gather news, citing Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972):

"We do not question the significance of free speech, press or assembly to the country's welfare. Nor is it suggest-

---

8. Prisoner petitions drawn *pro se* are also held to less stringent standards than formal pleadings drafted by lawyers. Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

9. Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (State prisoner appearing *pro se* is entitled to a hearing on his allegations that he suffered injuries while being subjected to confinement without due process.)

Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) (State prisoners need not exhaust state remedies before bringing Civil Rights action to challenge living conditions and disciplinary measures.)

Keeton v. Procunier, 468 F.2d 810 (9th Cir. 1972). (State prisoner is entitled to a hearing on his Civil Rights Act claim that state officials ran a kangeroo court inquisition before rescinding his parole recommendation).

Wright v. McMann, 460 F.2d 126 (2d Cir. 1972) (State prisoners are entitled under Civil Rights Act to damages against warden for "barbarous and inhumane" treatment by deputy warden.)

Bradley v. Nosser, 456 F.2d 835 (5th Cir. 1972) (10 CrL 2482) (Allegation of summary arrest and inhumane confinement states cause of action under Civil Rights Act.

10. Garrison v. Louisiana, 379 U.S. 64, 77, 85 S.Ct. 209, 217, 13 L.Ed.2d 125 (1964). *See also* Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936) and New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

ed that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated." At 681, 92 S.Ct. at 2656.

 However, ". . . [t]he right to speak and publish does not carry with it the unrestrained right to gather information," Zemel v. Rusk, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965), and accordingly the issue we must decide is whether the interview ban unduly restricts the flow of information to the public. In concluding that it does not [11] we again call attention to the Bureau's regulations giving news media extensive access to prison facilities and personnel, as well as the right to unlimited confidential correspondence with inmates. We are convinced that any hampering of the ability of the media to report occasioned by the interview ban is more than justified by the persuasive reasons given for its formulation.

It should be noted, however, that in this suit the interview ban dictated by the regulation is being attacked only insofar as it is applied at McNeil Island Penitentiary, a maximum security institution. Our holding today does not concern the application of the regulation to the wide variety of other institutions employed in the incarceration and rehabilitation of federal offenders.

The order of the district court granting summary judgment is affirmed.

KOELSCH, Circuit Judge (concurring specially).

As I read the record, the court below dismissed the actions on Rule 12(b)(6) grounds and did not, as the majority opinion seems to suggest, resort to nor pass upon the parties' respective Rule 56 motions for summary judgment.

Had it been necessary for the court to consider the latter motions, then we should reverse, for plaintiffs tendered a number of counter-affidavits setting out facts purporting to support their allegations that the questioned provision of the revised "Policy Statement" of February 11, 1972, violated, and were being applied in a manner that violated, their First Amendment rights. However, upon inspection of those provisions, the conclusion is manifest to me that none of them have, or could have, such an effect. The provisions are narrowly drawn and prohibit specific conduct that would, at least arguably, infringe upon a substantial federal interest in protecting the federal penal system. In short, I am firmly convinced that plaintiffs neither stated, nor could they state, any actionable claim or claims, and that we need not, indeed should not, suggest otherwise.

I concur in the result.

---

11. *See also* Smith et al. v. Bounds, et al. (E.D.N.C. Mar. 10, 1972) ; *contra*, Washington Post, et al. v. Kleindienst, et al. (D.D.C., unreported memorandum opinion of April 5, 1972, as supplemented by

opinion of Dec. 19, 1972). Cf. Yarish v. Nelson, 27 Cal.App.3d 893, 104 Cal.Rptr. 205 (1972), petition for rehearing denied by the California Supreme Court, November 16, 1972.