Booker T. HILLERY, Jr., et al.,
Plaintiffs,

v.

Raymond K. PROCUNIER et al.,
Defendants.

No. C-71-2150 SW.

United States District Court,
N. D. California.

Aug. 16, 1973.

Probable Jurisdiction Noted Jan. 7, 1974.
See 94 S.Ct. 862.

ment of Corrections Manual, which provides:

"Press and other media interviews with specific individual inmates will not be permitted."

## I.

Plaintiffs seek injunctive and declaratory relief under the Civil Rights Act, 42 U.S.C. § 1983. Jurisdiction is conferred upon this court under Title 28 U.S.C. §§ 1343(3), 1343(4) and 2201.

## II.

Plaintiffs Hillery, Spain, Bly and Guile are prisoners at San Quentin State Penitentiary. Editors of *Earth Magazine* wish to interview Hillery. Plaintiffs Pell, Sebal, and Jacobs are, respectively, free lance, newspaper, and television journalists, each of whom wishes to interview one of the three other inmate plaintiffs. Each of the inmate plaintiffs has affirmatively consented to an interview; each request was denied by the Warden on the basis of § 415.071. None of the prisoner plaintiffs has been alleged by the defendants to have presented disciplinary problems; nor have defendants alleged a proclivity of these media plaintiffs to create security risks.

Defendant Procunier is the Director of the State Department of Corrections. Defendant Nelson is the Warden of San Quentin; defendants Park and O'Brien are Associate Wardens.

Richard M. Doctoroff, Patti Roberts, San Francisco, Cal., for plaintiffs.

John T. Murphy, George R. Nock, Deputy Attys. Gen., State of California, San Francisco, Cal., for defendants.

Before HAMLIN, Circuit Judge, and EAST and WILLIAMS, District Judges.

## MEMORANDUM OF OPINION

SPENCER WILLIAMS, District Judge:

At issue here is the constitutionality of § 415.071 of the California Depart-

## III.

This case has its humble origins in a complaint drafted by a lay prisoner serving time at San Quentin. Shortly after the action was filed the court appointed counsel and the complaint was amended in March 1972 to add several other prisoners and media representatives as plaintiffs. The State filed a motion to dismiss for failure to state a claim upon which relief can be granted. The matter was thoroughly briefed and the court, on September 29, 1972, preliminarily enjoined the enforcement of § 415.071 and ordered defendants to sub-

mit proposed revisions to the regulations comporting to the standards set forth in the court's memorandum of decision. The State immediately moved for vacation of the order for lack of jurisdiction, arguing, for the first time since the initiation of the lawsuit, that since the regulation in question was applied by the Department of Corrections uniformly throughout the entire state penal system, the matter must be adjudicated by a three-judge court. Title 28 U.S.C. § 2281; Gilmore v. Lynch, 400 F.2d 228 (9th Cir. 1968), cert. denied, 393 U.S. 1092, 89 S.Ct. 854, 21 L.Ed.2d 783 (1969).[1]

Plaintiffs conceded that given the scope of application of § 415.071 the injunction was invalid. They urged the court to grant a temporary restraining order pending a final disposition by the three-judge panel. Upon affidavits submitted on behalf of the plaintiffs the court found that plaintiffs would suffer irreparable harm if the relief were not granted and issued the temporary restraining order under the same terms as provided in the original injunction. Title 28 U.S.C. § 2284(3).

Interim regulations were formulated by the prison officials and implemented in November 1973. None of the sought-after interviews took place, however, and plaintiffs subsequently moved the court to hold defendants in contempt for failure to comply with the order. Defendants moved the order be dissolved. Both motions were denied in light of the impending hearing by this court.

The panel convened February 22 to determine the constitutionality of § 415.071 as originally worded. The instant ruling is based on the arguments and testimony offered on that date and the memoranda of law and affidavits submitted by the parties.

## IV.

Prior to the implementation of § 415.071 the Department operated upon a laisse-faire policy with respect to press interviews with inmates. Until the late 1960s such interviews were relatively infrequent and resulted in little burden upon or danger to the institutions. With the rise of manifested discontent within the prisons and the consequent arousal of public concern and curiosity, however, the number of requests for media interviews increased substantially. The Department accommodated this influx despite the accompanying increased demands on its personnel and facilities. But beyond administrative hardships, the escalation of media access and exposure also created, in the Department's opinion, the phenomenon of the "prison celebrity" or "big wheel"—the prisoner who, through his writings and media coverage, gained a certain notoriety both outside and inside the institution. The influence of the "celebrity" over other inmates is looked upon by the Department as an added potential threat to the security and discipline within the prison.

It was against this background that the tragic events of August 21, 1971 took place. During an escape attempt at San Quentin three staff members and two inmates were killed. This was viewed by the officials as the climax of mounting disciplinary problems caused, in part, by its liberal posture with regard to press interviews, and on August 23 § 415.071 was adopted to mitigate the problem.

1. The litigation had proceeded for almost a year with the parties' and the court's attention focused on the interview practice at San Quentin, where all of the inmate plaintiffs are detained, the interviews sought by the media plaintiffs were to take place, and all the defendants, save Mr. Procunier, were employed. The State, in its moving papers, explained that it did not feel obliged to bring to the attention of the court the state-wide nature of the regulation or the jurisdictional point beforehand because it was of the opinion that the issue presented in the lawsuit was insubstantial—a somewhat curious appraisal given the court's obvious concern over the constitutional questions presented by the complaint, manifested, in part, by appointment of counsel for plaintiffs.

The regulation does not effect an absolute ban on all media interviews with inmates. The practice under the rule is to allow media representatives to enter the prison and, aided by the Warden, select at random interviewees from the prison population.[2] Thus, media representatives are able to interview an inmate, but unable to select a particular inmate. Similarly, a prisoner who happens to be randomly selected can express himself personally to the newsman or journalist, but cannot initiate an interview himself.[3]

## V.

The media plaintiffs herein and amicus curiae [4] argue that § 415.071 is violative of not only the prisoners' First Amendment rights, but also the press'. The court disagrees. It has been made clear in recent decisions by the Supreme Court that the press enjoys no greater right to access to news sources than the average citizen. In Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1971) the Court held that newsmen were not immune to grand jury solicitation of or information derived from the newsman's confidential sources. While the facts of that case are substantially different than those presented here, the Court unequivocally dismissed any notion that the First Amendment bestowed upon newsmen special news-gathering privileges. Reviewing past decisions on the subject [5] the Court observed:

"It has generally been held that the First Amendment does not guarantee the press a constitutional right of spe-

cial access to information not available to the public generally." 408 U.S. at 684, 92 S.Ct. at 2657.

As in *Branzburg*, the present case " . . . involve[s] no intrusions upon speech or assembly, no prior restraint or restriction on what the press may publish, and no express or implied command that the press publish what it prefers to withhold." 408 U.S. at 681, 92 S.Ct. at 2656.

This rationale was followed by the Ninth Circuit in the recent decision in Seattle-Tacoma Newspaper Guild, Local #82 v. Parker, 480 F.2d 1062 (9th Cir. 1973). In that case media plaintiffs and prisoner intervenors challenged a regulation implemented at McNeil Island Federal Penitentiary which prohibited press interviews with willing prisoners. With respect to the First Amendment claims of the media representatives, the court held that under Zemel v. Rusk, *supra*, the " ' . . . [t]he right to speak and publish does not carry with it the unrestrained right to gather information' " and that the "disruptive influences" at McNeil "outweigh the uncertain burden on news reporting that allegedly results from prohibiting prisoner interviews." 480 F.2d at 1066–1067.

▓ The *Seattle-Tacoma* ruling with respect to the media claims controls here. We note in passing, however, that cases cited by plaintiffs emanating from other jurisdictions apparently arriving at an opposite conclusion are distinguishable. In Washington Post v. Kleindienst, 357 F.Supp. 770 (D.D.C. 1972),[6] for example, the regulation held

---

2. It is not clear whether selection is made from all segments of the population or whether it is limited to those sections where visitors otherwise have access.

3. Prisoners engaged in writing for publications are authorized to meet with their publishers' representatives under a separate regulation covering *business* activities of prisoners.

4. American Civil Liberties Union.

5. *Inter alia*, Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Shep-

pard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

6. In its first Washington Post rulings (hereinafter "Washington Post I") the district court enjoined defendants' enforcement of a regulation banning personal interviews between press representatives and inmates. Defendants secured a stay of that ruling by the Supreme Court (Kleindienst v. Washington Post Co., 406 U.S. 912, 92 S.Ct. 1761, 32 L.Ed.2d 112 (1972)) and appealed the decision to the court of appeals. That court

unconstitutional barred *all* interviews with inmates at federal penitentiaries in Connecticut and Pennsylvania. The court held that "[a] continuing flat ban against press interviews of any prisoner, at any time, in any institution, is on its face arbitrary." *Washington Post I* at p. 773. In that context, it is apparent the press was not being granted a *special* right of access to prisoners, but simply *some* access. Even under § 415.-071 as it stood before today's ruling the press was given the freedom to enter the California institutions and interview at random, and it is the conclusion of this court that the even broader access afforded prisoners by today's ruling sufficiently protects whatever rights the press may have with respect to interviews with inmates.

### VI.

■ We turn next to the prisoners' rights as they are affected by § 415.071. Case law dealing with the constitutionality of prison regulations has proliferated in recent years. From those decisions the court discerns three axioms within whose bounds the current analysis must take place. 1) It is clear that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 68 S.Ct. 1049, 92 L. Ed. 1356 (1948).[7] 2) Further, prison officials are properly given a great degree of discretion in the administration of penal institutions. Stroud v. Swope, 187 F.2d 850 (9th Cir. 1951); Seale v. Manson, 326 F.Supp. 1375 (D.Conn.

1971) and cases cited at 1379. 3) But it is equally clear that a prisoner does not lose all constitutional rights with the slamming of the jailhouse door (Gilmore v. Lynch, 319 F.Supp. 105 (N.D.Cal. 1970), aff'd Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142; Seale v. Manson, *supra*, 326 F.Supp. at 1379), particularly where the prisoner's First Amendment rights are imperiled. Nolan v. Fitzpatrick, 326 F.Supp. 209 (D.Mass.1971), reversed on other grounds, 451 F.2d 545 (1st Cir. 1971), Burnham v. Oswald, 342 F.Supp. 880 (W.D.N.Y.1972), Washington Post Co. v. Kleindienst I, *supra*.

That § 415.071 abridges, to some degree, plaintiffs' freedom of expression is certain. But even in the "outside world" certain limitations on speech are constitutionally permissible. See Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). In determining whether this section is unconstitutional the court must first discern and then balance the prisoners' interests against those of the State.

■ Defendants argue that plaintiffs' First Amendment rights are sufficiently protected by the press regulation as it stands, in that *written* communications to the press remain unobstructed and personal interviews are permitted, albeit on the random basis described above. But the random selection conditions a prisoner's exercise of his right to express himself on the luck of the draw. And, under this method, the prisoner with the most to say may, with bad luck, never be able to say it effectively. The court is of the opinion that face-to-face interviews with media representatives

---

remanded the case to the district court for reconsideration in light of Branzburg v. Hayes, *supra,* and for further evidentiary proceedings to examine, among other issues, the necessity of personal interviews and the legitimacy of the "big wheel" theory. Washington Post v. Kleindienst, 155 U.S. App.D.C. 283, 477 F.2d 1168 (1972). The district court held further hearings and issued a Supplemental Memorandum, confirming its earlier rulings and specifically find-

ing that personal interviews are essential to the exercise of both the prisoners' and medias' First Amendment rights, that the "big wheel" theory was unsubstantiated and that Branzburg was inapplicable. Washington Post Co. v. Kleindienst, 357 F.Supp. 779 (D.D.C.1972) (hereinafter "Washington Post II").

7. Holding, *inter alia*, a prisoner is not entitled to personally appear at the hearing of his habeas corpus petition.

are a vital element in the prisoners' rights under the First Amendment. Other courts have come to the same conclusion. In Burnham v. Oswald, *supra,* the court dealt with facts almost identical to those presented here. There, inmates at Attica State Prison and newsmen challenged prison regulations that were adopted shortly after the riot of September 9–13, 1971. The regulations permitted press interviews of inmates at the discretion of the Superintendent, who was authorized to deny a request if he determined it would adversely affect the "integrity" of the institution. "Integrity" was left undefined by the regulations. The court held that the regulations granted the Superintendent too broad a discretion in his determination of whether an interview could be held.

> "The court holds that an interview with a consenting inmate must be permitted unless it is determined that to hold the interview would present a clear and present danger of breach of the security, discipline or orderly administration of the institution, [citations omitted], or that the inmate had clearly abused his right of access to the press." 342 F.Supp. at 887.

A significant factor in the court's ruling was the finding that:

> "There are many inmates who would be deprived of their right to communicate if they could only correspond but not meet personally with newsmen. Further, there are many prison situations which can only be explored fully and accurately by a face-to-face interview." 342 F.Supp. at 885.[8]

A similar holding was enunciated in Washington Post Co. v. Kleindienst where the court was persuaded by the plaintiffs' argument that "[c]ommunication by correspondence is . . . too impersonal and timeconsuming. In order to write reliable stories, . . . there is a need to observe demeanor, to probe by questioning and to overcome the barrier of semi-illiteracy and

suspicion that may inhibit inmates when they write. Prison tours and related conversations with individuals or groups are . . . too hit-and-miss, too limited, too casual, too unproductive to enable a reporter to probe a given situation." Washington Post I, 357 F.Supp. at p. 773; Washington Post II, 357 F.Supp. at p. 781. See, also, Comment, A Prisoner-Press Interview Right, 11 Am. Crim.L.R. 273 (1972). The court fails to see how either of the two virtues of personal interviews—assisting inarticulate inmates express themselves clearly and verifying their stories—can in themselves be objected to by the authorities.

■■ Which brings us to an evaluation of the prison's interest in the preservation of § 415.071. It is a fundamental precept of constitutional law that when a state restricts a First Amendment right, especially when that restriction is imposed prior to publication, it must be able to show a *compelling* interest advanced by that regulation. New York Times Co. v. United States, 403 U. S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), Edwards v. South Carolina, 372 U. S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1962). This standard applies in the prison context (Nolan v. Fitzpatrick, *supra,* Burnham v. Oswald, *supra,* 342 F. Supp. at 885, Fortune Society v. Mc-Ginnis, 319 F.Supp. 901, 904 (S.D.N.Y. 1970), Seale v. Manson, *supra.* Cf. Martinez v. Procunier, 354 F.Supp. 1092 (N.D.Cal.1973) (three-judge court), at pp. 7–8), despite language used by other courts, in dealing with similar cases, that at first glance appears to indicate a lesser standard should be employed. Defendants cite Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970) for the proposition that a prisoner's right of expression can be limited if the regulation is related both "reasonably . . . and necessarily . . . to the advancement of some justifiable purpose of imprisonment." 314 F.Supp. at 1024. The court believes that this rule is not

---

8. But see Smith v. Bounds, Civ.No.2914 (E. D.N.C. March 10, 1972) where it was held

that written communication to the press sufficiently preserved the inmates' rights.

only consistent with the "compelling interest" test, it is its concomitant. That is, not only must the state show a compelling interest in limiting the prisoners' rights, but the *method* it chooses to effect the limitation must be related— "reasonably and necessarily"—to the end sought.

■ To the extent that *Carothers* can be read as qualifying otherwise broad First Amendment liberties in the prison context, this court agrees that, while the stricter standard applies, the State can generally illustrate a compelling interest more readily than it can when defending regulations affecting the free population. This is so because prisons, by their very nature, are institutions inhabited by persons who abused various liberties, some of whom have illustrated a propensity for violence, who are forced to live in close confines. There is a lower threshold of "clear and present danger" in these institutions. But while prison discipline, inmate safety, and rehabilitation are indisputably "compelling state interests" (See *Carothers, supra,* at 1024), regulations advancing those interests must be tailored so as not to unnecessarily restrict First Amendment rights.

Turning to the instant regulation, the state has offered four grounds upon which it attempts to defend § 415.071. None are sufficiently substantiated by fact to sustain the defense.

## A.

### Administrative Burden

■ The state anticipates that too wide an access by the press to inmates will result in an intolerable demand on facilities and man-hours. Defendants point to one history in which a prisoner was interviewed sixty-six times in a six-month period. On closer examination, however, this "example" was not only revealed to be a clear exception to the then prevailing practice but appears to have been totally media-initiated. In fact, the number of requests *by prison-ers* for press interviews was minimal, as indicated in Warden Nelson's Answers to Interrogatories (filed April 10, 1972):

"4. Over the past year (Feb. 20, 1971–Feb. 20, 1972) how many prisoners have requested interviews with outside media?"

\* \* \* \* \* \*

"A: We have no record of this information. *Requests by prisoners for interviews with media are rare, and none are recalled.*" (Emphasis added).

Additionally, the prison maintained no records as to the number of interviews initiated by media personnel although, presumably, such requests were somewhat more frequent. And insofar as the prisoner's right to interview is concerned, the Warden's response to Interrogatory #4 dispels any notion that prisoner-requested interviews have presented an extraordinary administrative burden. In short, the present regulation attempts to obviate an administrative problem that does not exist, and is therefore neither reasonably nor necessarily related to a legitimate state interest.

■ By holding that the State has made an insufficient factual showing of administrative burden, the court does not imply that reasonable limitations as to the time, place, and manner of such interviews cannot be imposed. On the contrary, it is obvious that regulations governing the number of interviews each prisoner is to be allowed, the length of such interviews, and assessment of reasonable costs to reimburse the administration for *extraordinary* services would be permissible. See Seale v. Manson, *supra,* 326 F.Supp. at 1383.

## B.

### Security

Much of the State's argument with respect to the security factor of § 415.071 hangs on the "big wheel" theory dis-

cussed in Subparagraph D *infra.* The court takes the defendants to argue, additionally, that the mere presence of large numbers of newsmen endangers the security of the prisons. It might first be noted that newsmen " . . . are not inherently security risks." Nolan v. Fitzpatrick, *supra,* 326 F.Supp. at 213. And put in the proper perspective, it becomes apparent that the interview program envisioned by the plaintiffs would be but one relatively small enterprise among a myriad of others. Mr. Philip Guthrie, Information Officer for the Department of Corrections, testified at the hearing that "hundreds" of private citizens visit California penal institutions every day. As many as 10,000 persons visit San Quentin every year, participating in events ranging from guided tours to art exhibits to bridge tournaments. Similarly, friends and relatives visit inmates regularly and inmates have virtually unlimited access to legal counsel.

The defendants have made no specific showing as to how news media personnel have jeopardized security in the past;[9] and they have conspicuously failed even to allege that any of the inmate plaintiffs have shown propensities for violence or trouble-making, or that they in any way pose a threat to prison security.

Prison security is patently a legitimate concern of the defendants, but § 415.071, covering as it does all interviews with specific inmates, is too drastic a means by which to achieve it. As mentioned above, the number of interviews may be reasonably limited so as to assure adequate supervision by correctional officers. Likewise, prison officials may require interviewers to submit to reasonable searches for contraband, escape plans, or weapons as a precondition to the interview. Finally, if the authorities have good cause to believe that a *particular* interview would pose a clear and present danger to prison security, it may be denied.

## C.

### *Rehabilitation*

The State offered little more than vague speculation as to how § 415.071 advances the rehabilitative programs in California prisons and has thus failed to carry its burden of justifying the section on this ground.

## D.

### *The "Big Wheel" Theory*

Defendants' principal argument in defense of § 415.071 rests on the "Big Wheel" or "celebrity" theory, which states that by gaining notoriety through the press, a particular prisoner oftentimes also gains the respect of and an influence over his fellow inmates. This understandably would have several undesirable effects. The elevation of individual prisoners to "celebrity" status is detrimental to the Department's disciplinary efforts, which are founded on the policy of treating all prisoners equally, giving no single prisoner specific privileges with which he might use to obtain an advantage over others. When an individual prisoner achieves a sense of special status he is able, defendants contend, to induce other inmates to combine and engage in behavior they otherwise would not exhibit. When two or more rival "big wheels" rise to power, a situation not unlike street gang warfare can result, leading to large scale intimidation, coercion and violence.

The spectre of such a state of affairs is indeed alarming. And this court entertains no doubt that violence exists in correctional institutions in California or that the Department's task of reducing violence is an exceedingly difficult one. The question here, however, is whether § 415.071 is reasonably and necessarily related to that task, and the court must conclude that the "big wheel" theory, in the end, has been shown by defendants, *in this particular case,* to be little more than that—a theory. The events out of

9. The events of August 21, described above, were allegedly sparked by an inmate being given a weapon by an *attorney.*

which § 415.071 emanated and by which the Department has attempted to justify the rule—the August 21 incident—serve to illustrate the inapplicability of the theory in this case. One of the prisoners who was killed that day had been interviewed sixty-six times in a six-month period and had published a book composed of letters he had written to members of his family and his attorney which, in substantial part, were critical of society in general and prison administration in particular. Mr. Guthrie described the prisoner as a "big wheel" and stated he believed the August 21 violence arose, in part, out of the theretofore liberal interview policy. However, when questioned further he admitted that the prisoner has in fact only a limited reputation outside prison and had not achieved "celebrity" status within it prior to August 21. Such status was attained only *after* his death. Mr. Guthrie also testified that between 1970 and the date of the hearing ten professional employees and twenty inmates were murdered in California correctional institutions and that in his opinion this violence can be attributed to the liberal interview policy and the influence of the "big wheels." But when asked to explain the nature of the connection between interviews and the violence neither Mr. Guthrie in his testimony, nor defense counsel in his argument, nor Mr. Procunier in his affidavit, could specify facts showing a direct relationship between the two.

Seattle-Tacoma Newspaper Guild, Local #82 v. Parker, *supra,* is distinguishable with respect to this issue on two grounds. First, the evidence in Seattle-Tacoma persuasively illustrated that the prison officials had made a "considerable study" of the interview practice and had "concluded that the ban on interviews is necessary to maintain the discipline, custody and control of the prison." (480 F.2d at 1065). As related above, no such showing was made in the present case; on the contrary, defendants' testimony compels a finding that no correlation between press interviews and prison disturbance exists. Secondly, the *Seattle-Tacoma* case dealt with a regulation applicable only to McNeil Island Penitentiary, a maximum security institution designated for detention of selected prisoners who present serious disciplinary and security problems. (At 1064). The regulations had been promulgated on the heels of a riot. Here, the challenged regulations are applied at *all* California state penal institutions, from maximum security prisons to work farms, without regard to the various safety and disciplinary characteristics within the system. On this ground alone the regulation is unconstitutionally overbroad.

Seale v. Manson, *supra,* cited by defendants in support of the theory is also inapposite. There the plaintiff was being held at a Connecticut state prison without bail on serious criminal charges. He challenged a regulation that expressly *permitted* press interviews with specific inmates, but required prior approval by the Warden. On two occasions reporters were denied access to Seale. The court held, and we agree, that the defendants had a legitimate concern in preventing a prisoner from becoming a "wheel" in the institution and that *limiting* (not, as here, totally excluding) interviews with specific inmates was a permissible means by which to achieve that goal. The court notes that in *Seale* it appears that plaintiff did not disclaim his reputation as a "wheel". In the present case it is not alleged that any of the named plaintiffs have shown a desire to become a celebrity. Mr. Guthrie stated that at the present time he is unable to name a single celebrity throughout the entire California correctional system. The unavoidable conclusion is that no matter how plausible the "big wheel" theory, there is no hard evidence that the danger presented by interviews is either clear or present. The regulations flatly prohibiting such interviews are therefore unconstitutional.

## VII.

For the reasons above, it is Adjudged, Ordered and Decreed that:

1. Defendants' motion for dismissal as against the media plaintiffs is Granted.

2. The inmate plaintiffs' motion for summary judgment is Granted.

3. Defendants shall within 30 days present to the court proposed regulations comporting to this decision.

4. Defendants shall permit the interviews sought in this litigation at the earliest practicable time under reasonable conditions and supervision.

HAMLIN, Circuit Judge (concurring):

For the reasons expressed in the majority opinion I concur in the holding therein that section 415.071 is not violative of the rights of the news media.

I concur also in the holding in that opinion that said section is violative of the rights of the plaintiff inmates, but I do so on a different basis.

The majority examines the constitutionality of the regulation prohibiting inmates from requesting interviews with the news media under the "compelling interest" test, applicable to First Amendment restrictions in society at large.

However, in Seattle-Tacoma Newspaper Guild, Local #82 v. Parker, 480 F. 2d 1062 (9 Cir. 1973), the Ninth Circuit Court of Appeals eschewed the "compelling interest" test as applied to First Amendment restrictions in the prison context, and substituted therefor the "rational basis" analysis:

" * * * the Bureau of Prisons has given considerable study to the disruptive effects of prisoner interviews on prison administration, and has concluded that the ban on interviews is necessary to maintain the discipline, custody and control of the prison. We are unable to say that that conclusion 'lacks support in any *rational* and constitutionally acceptable concept of a prison system.' (citation omitted). We find that the interview ban is *reasonable action* within the scope of the wide discretion of the prison administrators and that it does not violate the prisoners' First Amendment rights." (citation omitted.) *Id.*, at 1065–1066. (emphasis added.) *See also*, O'Malley v. Brierley, 477 F.2d 785 (3 Cir. 1973); Morales v. Schmidt, (7 Cir. January 17, 1973.)

While the specific factual situation in *Seattle-Tacoma* differs from the instant case, it is my conclusion that the *Seattle-tacoma* rationale is herein controlling.

But even under to broader "rational basis" analysis, the blanket prohibition of inmate interviews with the media must fall. As the majority notes, there is insufficient evidence in the record to substantiate such a complete ban.

The defendants may, of course, refuse to permit specific inmates in specific circumstances from conducting interviews with the media, where legitimate reasons exist.